# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| UNIVERSAL CONNECTIVITY TECHNOLOGIES INC.<br><br>               Plaintiff,<br>   v.<br><br>DELL TECHNOLOGIES INC. and DELL INC.,<br>               Defendants. | CASE NO. 1:23-cv-01506-RP<br><br>**JURY TRIAL DEMANDED** |

## **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.     **SUMMARY OF APPLICABLE LAW** ............................................................1

II.    **TERMS FOR CONSTRUCTION** ...........................................................3

    A.    The "logic to" terms are indefinite ('520 and '231 Patents). ....................3

        1.    The "logic to" terms are means-plus-function subject to 35 U.S.C. § 112, ¶ 6.........................................................................................................4

        2.    The "logic to…" terms are indefinite because the patents do not disclose adequate corresponding structure. ..............................................7

        a.    "logic to detect" terms ('231 Patent, claim 10 and dependents)..................7

        b.    "logic to discover" / "logic to detect" terms ('231 Patent, claim 16 and dependents) ...........................................................................................10

        c.    "logic to convert" ('520 Patent, claims 12, 19, and dependents)..............11

        d.    "logic to arbitrate" ('520 Patent, claims 12, 19, and dependents) ............12

    B.    "a preemption component that signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet" ('905 Patent, claim 21 and dependents)................................................................................14

        1.    "Preemption component that…" is means-plus-function .........................15

        2.    The '905 Patent does not disclose adequate corresponding structure and, thus, "preemption component…" is indefinite ..........................................16

    C.    "an identification component that identifies a packet type of a packet of symbols" ('798 Patent, claim 19 and dependents)..............................................................17

        1.    "Identification component that…" is means-plus-function .....................18

        2.    The '798 Patent does not disclose adequate corresponding structure and, thus, "identification component…" is indefinite ......................................18

    D.    "application data and control bits" ('307 Patent, all asserted claims) ..................19

    E.    "AV sink operation mode" and "AV source operation mode" ('265 Patent, all claims)....................................................................................................................21

    F.    "mobile device" ('520 Patent, all claims and '231 Patent, claim 14)...................23

    G.    "standard protocol" / "modified protocol" ('520 Patent, all claims) .....................24

    H.    "the modified protocol being a modification of the standard protocol that is not included in the standard protocol" ('520 Patent, all claims)................................26

    I.    "the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" ('231 Patent, 10 and dependents)...................27

    J.    "first physical channel" ('103 Patent, all claims) ...............................................28

    K.    "the first synchronization signal" ('103 Patent, claim 17)....................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003).................................................................................29

*Alarm.com, Inc. v. SecureNet Techs., LLC*,
  No. 15-cv-807-RGA, 2019 WL 3996883 (D. Del. Aug. 23, 2019) ........................15

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  No. 1:10-cv-910-LMB, 2018 WL 1699429 (E.D. Va. Apr. 6, 2018) ......................15

*Aristocrat Techs. Australia Pty Ltd. v. Intern. Game Tech.*,
  521 F. 3d 1328 (Fed. Cir. 2008)...........................................................................9, 11

*Aylus Networks, Inc. v. Apple Inc.*,
  856 F.3d 1353 (Fed. Cir. 2017)...........................................................................21, 26

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)...............................................................................30

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001).................................................................................2

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013)...............................................................................29

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*,
  382 F. Supp. 3d 586 (E.D. Tex. 2019) ....................................................................15

*Egenera, Inc. v. Cisco Sys., Inc.*
  972 F.3d 1367 (Fed. Cir. 2020)........................................................................ *passim*

*Fintiv, Inc. v. PayPal Holdings, Inc.*,
  134 F.4th 1377 (Fed. Cir. 2025) .............................................................................15

*Grace Instr. Indus., LLC v. Chandler Instr. Co.*,
  57 F.4th 1001 (Fed. Cir. 2023) .................................................................................1

*Halliburton Energy Svcs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)...............................................................................24

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008)...........................................................................8, 10

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006)................................................................................20

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC,*
  732 F.3d 1376 (Fed. Cir. 2013)..........................................................................17, 19

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.,*
  902 F.3d 1372 (Fed. Cir. 2018)................................................................................14

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.,*
  302 F.3d 1352 (Fed. Cir. 2002)................................................................................23

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB,*
  344 F. 3d 1205 (Fed. Cir. 2003)..................................................................................3

*Nautilus, Inc. v. Biosig Instr., Inc.,*
  572 U.S. 898 (2014)....................................................................................................2

*Net MoneyIN, Inc. v. VeriSign, Inc.,*
  545 F.3d 1359 (Fed. Cir. 2008)..........................................................................8, 10

*Noah Sys., Inc. v. Intuit Inc.,*
  675 F.3d 1302 (Fed. Cir. 2012)........................................................................9, 11, 12

*O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.,*
  521 F.3d 1351 (Fed. Cir. 2008)..................................................................................1

*In re Packard,*
  751 F.3d 1307 (Fed. Cir. 2014)................................................................................30

*PC Connector Solutions LLC v. SmartDisk Corp.,*
  406 F.3d 1359 (Fed. Cir. 2005)..........................................................................24, 25

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc).............................................................1, 2

*Qualcomm Inc. v. Intel Corp.,*
  6 F.4th 1256 (Fed. Cir. 2021) ..................................................................................13

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.,*
  989 F.3d 1002 (Fed. Cir. 2021)................................................................................15

*Rembrandt Data Techs., LP v. AOL, LLC,*
  641 F.3d 1331 (Fed. Cir. 2011)................................................................................30

*Robert Bosch, LLC v. Snap-On Inc.,*
  769 F.3d 1094 (Fed. Cir. 2014)................................................................................15

*SandBox Logistics LLC v. Proppant Express Invs. LLC*,
    813 F. App'x 548 (Fed. Cir. 2020) ........................................................29, 30

*Seiko Epson Corp. v. Coretronic Corp.*,
    376 F. App'x 23 (Fed. Cir. 2010) ...............................................................22

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)....................................................................6

*TorPharm, Inc. v. Ranbaxy Pharms., Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003)..................................................................29

*Traxcell Techs., LLC v. Sprint Commc'ns Co.*,
    15 F.4th 1121 (Fed. Cir. 2021) ....................................................................7

*Uniloc USA, Inc. v. Apple, Inc.*,
    No. 19-cv-1692-EJD, 2021 WL 432183 (N.D. Cal. Jan. 15, 2021) .........24

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015).........................................................3, 4, 7

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
    442 F. 3d 1322 (Fed. Cir. 2006)..................................................................27

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..................................................................13

*XR Commc'ns, LLC v. ARRIS Sols., Inc.*,
    No. 2022-1125, 2023 WL 3529830 (Fed. Cir. May 18, 2023) ..................4

**Statutes**

35 U.S.C. § 112................................................................................... *passim*

35 U.S.C. § 112(6) .............................................................................. *passim*

**TABLE OF EXHIBITS**

| EXH. | DESCRIPTION |
|:---:|---|
| 1 | U.S. Patent No. 7,154,905 ("the '905 Patent") |
| 2 | U.S. Patent No. 7,187,307 ("the '307 Patent") |
| 3 | U.S. Patent No. 7,746,798 ("the '798 Patent") |
| 4 | U.S. Patent No. 7,856,520 ("the '520 Patent") |
| 5 | U.S. Patent No. 7,921,231 ("the '231 Patent") |
| 6 | U.S. Patent No. 9,852,103 ("the '103 Patent") |
| 7 | U.S. Patent No. 9,232,265 ("the '265 Patent") |
| 8 | Declaration of Steve Novak (Dell's Expert Witness) |
| 9 | Manual of Patent Examining Procedure, § 2181 |
| 10 | Excerpts from *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms*, Seventh Edition (2000) |
| 11 | Excerpts from *IBM Dictionary of Computing* (1994) |
| 12 | Universal Connectivity Technology Inc.'s Disclosure of Preliminary Claim Constructions in the present case |
| 13 | U.S. Patent No. 4,486,739 to Franaszek et al. ("Franaszek") |
| 14 | Excerpts from UCT's patent owner preliminary response to the petition for *inter partes* review of the '307 Patent in *HP Inc. et al. v. Universal Connectivity Technologies Inc.*, IPR2024-01429 (Paper 8) |
| 15 | Excerpts from Official Transcripts of Proceedings – Markman Hearing in *Universal Connectivity Technologies, Inc. v. Lenovo Group Limited*, No. 2:23-cv-00449-JRG (EDTX, May 20, 2025) |
| 16 | Excerpts from *Wiley Electrical and Electronics Engineering Dictionary* (2004) |
| 17 | Excerpts from *Microsoft Computer Dictionary*, Fifth Edition (2002) |
| 18 | Additional excerpts from *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms*, Seventh Edition (2000) |

| EXH. | DESCRIPTION |
|---|---|
| 19 | Excerpts from S.M.H. Collin, *Dictionary of Computing*, Fifth Edition (2004) |
| 20 | Excerpts from *McGraw-Hill Dictionary of Engineering*, Second Edition (2003) |
| 21 | Excerpts from transcript of remotely conducted videotaped deposition of Vijay Madisetti, taken in *Universal Connectivity Technologies, Inc. v. HP Inc.*, No. 5:24-cv-04097-NW (N.D. Cal. April 25, 2025) |
| 22 | Excerpts from Declaration of Vijay Madisetti in *Daedalus Blue, LLC v. Microsoft Corp.*, No. 6:20-cv-1152-ADA, Dkt. No. 29-1 (W.D. Tex., Sept. 21, 2021) |
| 23 | Excerpts from HP Inc.'s Responsive Brief in Support of Its Proposed Claim Constructions in *Universal Connectivity Technologies, Inc. v. HP Inc.*, No. 5:24-cv-04097-NW, Dkt. No. 145 (N.D. Cal. July 7, 2025) |
| 24 | Excerpts from Plaintiff Universal Connectivity Technologies Inc.'s Reply Claim Construction Brief in *Universal Connectivity Technologies, Inc. v. HP Inc.*, No. 5:24-cv-04097-NW, Dkt. No. 149 (N.D. Cal. July 21, 2025) |
| 25 | Excerpts from Dell XPS M1710 Owner's Manual (2006) |
| 26 | Excerpts from Sony User Guide Personal Computer VGN-FZ100 Series (2007) |
| 27 | *CeBIT 2007: Review Samsung M60 Notebook* |
| 28 | Excerpts from UCT's patent owner preliminary response to the petition for *inter partes* review of the '520 Patent in *Lenovo (United States) Inc. et al. v. Universal Connectivity Technologies Inc.*, IPR2024-01482 (Paper 10) |
| 29 | Excerpts from Decision Denying Institution of *Inter Partes* Review of '520 Patent in in *Lenovo (United States) Inc. et al. v. Universal Connectivity Technologies Inc.*, IPR2024-01482 (Paper 17) |
| 30 | Excerpts from *Merriam-Webster's Collegiate Dictionary*, Eleventh Edition (2007) |
| 31 | Excerpts from prosecution history of '103 Patent |
| 32 | VESA Digital Flat Panel (DFP) Version 1 (Feb. 14, 1999) |
| 33 | U.S. Patent Appl. Publ. No. 2007/0201492 ("Kobayashi") |
| 34 | Excerpts from Silicon Image, Inc.'s Form 10-K Annual Report for the fiscal year ending December 31, 2010, available at https://www.sec.gov/Archives/edgar/data/1003214/000100321411000011/form_10-k.htm |

| EXH. | DESCRIPTION |
|------|-------------|
| 35 | Excerpts from Patt and Patel, *Introduction to Computing Systems*, Second Edition (2004) |
| 36 | Excerpts from UCT's Identification of Preliminary Extrinsic Evidence in the present case |
| 37 | Excerpts from Wikipedia entry for USB, downloaded from https://en.wikipedia.org/wiki/USB (Aug. 18, 2025) |
| 38 | Excerpts from Wikipedia entry for USB On-the-Go, downloaded from https://en.wikipedia.org/wiki/USB_On-The-Go (Aug. 26, 2025) |
| 39 | Excerpts from Wikipedia entry for HDMI, downloaded from https://en.wikipedia.org/wiki/HDMI (Aug. 18, 2025) |
| 40 | Dictionary.com definition of "logic," available at https://www.dictionary.com/browse/logic |
| 41 | Merriam-Webster.com definition of "logic," available at https://merriam-webster.com/dictionary/logic |
| 42 | Excerpts from prosecution history of '520 Patent |

Universal Connectivity Technologies ("UCT") alleges that Dell Technologies Inc. and Dell Inc. (collectively, "Dell") infringe U.S. Patents Nos. 7,154,905 ("the '905 Patent"), 7,187,307 ("the '307 Patent"), 7,746,798 ("the '798 Patent"), 9,232,265 ("the '265 Patent"), 8,680,712 ("the '712 Patent"), 7,856,520 ("the '520 Patent"), 7,921,231 ("the '231 Patent"), and 9,852,103 ("the '103 Patent") (collectively, "Asserted Patents"), which relate generally to data connectivity between electronic devices. The parties exchanged over 60 disputed terms for construction from the eight asserted patents. Due to page constraints, Dell focuses its briefing on the terms most likely to narrow the issues before the Court. Dell reserves the right to address other claim scope disputes to the extent they are relevant later in the case. A chart summarizing the parties' agreed constructions and proposed constructions of briefed disputed terms is attached as Appendix A.

I.     **SUMMARY OF APPLICABLE LAW**

Claim construction requires the court to "determine[e] how a skilled artisan would understand a claim term 'in the context of the entire patent, including the specification.'"[1] *Grace Instr. Indus., LLC v. Chandler Instr. Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). The purpose of claim construction is to resolve disputes about the meaning and scope of the claims. *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Although the "words of a claim are generally given their ordinary and customary meaning" (*Phillips*, 415 F.3d at 1312), adopting "plain and ordinary meaning" as the construction is inadequate when doing so does not resolve the parties' dispute. *O2 Micro*, 521 F.3d at 1361.

Courts begin by considering the language of the claims themselves, but the claims must be

---

[1] Dell adopts its expert's definition of a person of ordinary skill in the art ("POSITA"). Ex. 8, ¶ 25.

interpreted "in view of the specification, of which they are a part." *Phillips,* 415 F.3d at 1315. The Federal Circuit has made clear that the specification is the "single best guide to the meaning of a disputed term," is "[u]sually . . . dispositive," and is "the primary basis for construing the claims." *Id.* at 1315-17. "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. The specification's relevance is not limited to only express definitions—it is always the "single best guide to the meaning of a disputed term" and may "act[] as a dictionary [both] when it expressly defines terms . . . or when it defines terms by implication." *Id.* at 1321; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.,* 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"). Courts also consider the patent's prosecution history which, along with the claims and specification, form the "intrinsic evidence." *Phillips,* 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* Courts may also consider "extrinsic evidence" such as dictionaries, treatises, and expert testimony. *See id.* at 1317–18. "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

A claim is indefinite under 35 U.S.C. § 112, ¶ 2 where the claim language, "viewed in light of the specification and prosecution history, [fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instr., Inc.*, 572 U.S. 898, 910 (2014).

A limitation is subject to means-plus-function interpretation where it recites a "means . . . for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, ¶ 6. Although courts presume that claim terms without the word "means" do not invoke § 112(6), this presumption is "not strong" and is rebutted where the "claim term either fails to recite sufficiently definite structure or recites function without reciting sufficient structure for performing that function." *Egenera, Inc. v. Cisco Sys., Inc.* 972 F.3d 1367, 1372-73 (Fed. Cir. 2020) (internal quotations omitted). "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (internal quotations omitted). If a term is subject to § 112(6) but the specification "fails to disclose adequate corresponding structure, the claim is indefinite." *Id.* at 1352. The test is whether the specification itself links adequate structure to the claimed function, not whether a POSITA could conceive of such structure. *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F. 3d 1205, 1212 (Fed. Cir. 2003).

## II.    TERMS FOR CONSTRUCTION

### A.    The "logic to" terms are indefinite ('520 and '231 Patents).

Certain claims of the '520 and '231 Patents recite one or more limitations of the form "logic to [description of function]." Specifically:

- "***logic to detect*** signals on the cable interface, the logic including: a ***first logic to detect*** a voltage value on the power bus . . . and a ***second logic to detect*** signals on the control bus…" ('231 Patent, claim 10)

- "***logic to discover*** a transmitting device coupled with the receiving device, wherein the logic includes: a ***first logic to detect*** a first signal on the control bus … and a ***second logic to detect*** a power signal from the transmitting device…" ('231 Patent, claim 16)

- "***logic to convert*** each of one or more control signals into a data packet" / "***logic to***

3

*convert* each of the one or more data packets into a control signal" ('520 Patent, claims 12 / 19)

- "*logic to arbitrate* use of the first control bus, the logic to arbitrate use being operable to: determine whether the control bus is in use by the receiving [transmitting] device, and if the first control bus is not in use by the receiving [transmitting] device, conduct arbitration for control of the first control bus" ('520 Patent, claims 12 and 19)

Because "logic" fails to connote sufficient structure to a POSITA and the specification discloses no structure adequate to perform the recited functions, these are indefinite means-plus-function limitations. *Williamson*, 792 F.3d at 1349, 1351–52.

### 1. The "logic to" terms are means-plus-function subject to 35 U.S.C. § 112, ¶ 6.

The Federal Circuit has determined—in nearly identical circumstances—that "logic" is "no more than a 'black box recitation of structure' that is simply a generic substitute for 'means.'" *Egenera*, 972 F.3d at 1375 (quoting *Williamson*, 792 F.3d at 1350); *see also XR Commc'ns, LLC v. ARRIS Sols., Inc.*, No. 2022-1125, 2023 WL 3529830, at *2–3 (Fed. Cir. May 18, 2023) ("'search receiver logic' invokes § 112 ¶ 6"). In *Egenera*, the Federal Circuit held that "logic to modify" was means-plus-function under § 112, ¶ 6 where the patent specification disclosed that logic could be "software logic" or firmware logic and the plaintiff argued that "'logic' denotes 'software, firmware, circuitry, or some combination thereof.'" *Egenera*, 972 F.3d at 1374–75. The Federal Circuit also held that § 112, ¶ 6 applies even if "logic" suggests "some *possible* structure in the general sense of software, firmware, or circuitry" because it does not identify "*sufficient*" structure "for performing the claimed functions" *Id.* at 1374 (emphasis added and original).

The claims do not identify any structure for "logic." The disputed elements are written in purely functional terms, and no surrounding claim limitations clarify a structure to perform the recited functions. Ex. 8, ¶¶ 89, 114-121. Indeed, the claims recite multiple logics that each perform very different functions, further confirming that "logic" is a black box placeholder for structure.

At the time of the inventions, a POSITA would understand that, as the Federal Circuit

found in *Egenera*, "logic" could refer to anything to perform the recited functions (e.g., software, hardware, or a combination of both). Ex. 8, ¶¶ 91, 122-125. Technical dictionaries—including those cited by UCT—uniformly support this understanding. *Id.*, ¶¶ 93-99; *see e.g.* Ex. 16 at 432 ("logic" is both "[t]he functions performed by a computer which involve operations such as mathematical computations and true/false comparisons…" and "[t]he circuits in a computer which enable the performance of logic functions or operations…"); Ex. 17 at 317 ("logic" is, "[i]n programming, the assertions, assumptions, and operations that define what a given program does. Defining the logic of a program is often the first step in developing the program's source code."); Ex. 20 at 332. So does UCT's expert in the HP and Lenovo cases, Vijay Madisetti, who previously declared that "logic is a well-defined and understood term . . . ***to refer to software that performs a specific task***." Ex. 22, ¶ 35. In the HP case, Dr. Madisetti did not dispute that "logic" can encompass a combination of hardware and software and did not disagree that "logic" as recited in these patents can take the form of other hardware that typically invokes § 112, ¶ 6, such as a "general-purpose computer" or "microprocessor." *See* Ex. 21, 103:6-12 (implying that the claimed functions may be performed by a combination of hardware and software); 91:15-21 (no opinion on general-purpose computer); 92:10-25 (no opinion on "CPU" or microprocessor).

The specifications are consistent with how a POSITA would have understood "logic" at the time. Ex. 8, ¶¶ 100-113. For example, UCT alleges that the following boilerplate excerpt from the patents discloses structure corresponding to the "logic to" limitations:

> [Various] processes [of the present invention] may be performed by ***hardware components*** or ***may be embodied in computer program or machine-executable instructions***, which may be used to cause a ***general-purpose or special-purpose processor*** or ***logic circuits programmed with the instructions*** to perform the processes. Alternatively, the processes may be performed by a ***combination of hardware and software***.

Ex. 4 at 10:4-10 (emphasis added); Ex. 5 at 10:37-42 (same). That excerpt does not define "logic"

and, if anything, indicates that the applicant intended ***not*** to exclude software, hardware ("hardware components"), or combinations of the two ("a general-purpose or special-purpose processor or logic circuits programmed with the instructions to perform the processes") from the scope of the alleged invention, let alone the claimed "logic." Ex. 8, ¶¶ 102-107. The patents also explain that the "present invention may also be downloaded as a computer program product"— that is, the claimed invention could be entirely software-based. Ex. 4 at 10:25-28; Ex. 5 at 10:57-60; Ex. 8, ¶ 108. Although none of these excerpts define "logic," they certainly do not demonstrate that the applicant redefined "logic" to connote something narrower than the plain meaning to a POSITA at the time. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer."). Ex. 8, ¶¶ 100-113.

In its co-pending suit against Lenovo, UCT argued that "logic" is limited to a specific form of hardware (logic circuits). Ex. 15 at 23:21-25:16, 26:11-27:25, 38:15-40:5. But such a narrow interpretation contradicts the specifications which, as discussed above, explain that "the present invention" ***could*** be purely software-based.[2] Ex. 4 at 10:25-28; Ex. 5 at 10:57-60; Ex. 8, ¶ 108. Moreover, the patents mention "logic circuits" only once (in boilerplate), and only to explain that such circuits—just like "a general-purpose or special purpose processor"—are "programmed" with "computer program or machine-executable, which may be used to cause" the logic circuits "to perform the processes," a clear description of combining hardware with software. Ex. 4, 10:4-9; Ex. 5, 10:36-41; Ex. 8, ¶¶ 104-106. A POSITA would understand that "logic" is broader than logic ***circuits***. Ex. 8, ¶¶ 91, 95, 104; *see also* Ex. 18 at 636-37, Ex. 16 at 432, Ex. 17 at 318, Ex. 19 at

---

[2] It also contradicts UCT's contentions in its co-pending case against HP, where it alleges that one of the recited "logics" "comprises the hardware ***and/or software*** in the Accused Product." Ex. 23 at 5:12-15 (quoting UCT's infringement contentions in that case) (emphasis added).

197-98 (all defining "logic circuit" separately from "logic").

Because "logic" in the '520 and '231 Patents is a black box placeholder for anything (e.g., software, hardware, or a combination) to perform a function, the "logic to…" terms are subject to means-plus-function interpretation for the same reasons as in *Egenera*. 972 F.3d at 1374–75. As explained below, the specifications do not disclose adequate structure corresponding to the "logic to…" limitations and they are therefore indefinite.

### 2. The "logic to…" terms are indefinite because the patents do not disclose adequate corresponding structure.

UCT has not named any structure that it alleges is sufficient to perform the recited functions of "logic;" instead, it identified only string cites to excerpts of the patent specifications. One of those excerpts is the boilerplate discussed above, which does not link any structure to the functions of the "logic to" elements. *Williamson*, 792 F.3d at 1352. As discussed below, the other excerpts also do not disclose sufficient structure to perform the claimed functions and, thus, the "logic to" terms are indefinite under 35 U.S.C. § 112, ¶ 2. *Traxcell Techs., LLC v. Sprint Commc'ns Co.*, 15 F.4th 1121, 1134 (Fed. Cir. 2021) (citing *Williamson*, 792 F.3d at 1351–52).

### a. "logic to detect" terms ('231 Patent, claim 10 and dependents)

| Term | Defendants | Plaintiff |
|---|---|---|
| **"logic to detect signals on the cable interface" / "a first logic to detect a voltage value on the power bus…" / "a second logic to detect signals on the control bus…"** | Means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function: (agreed)**<br><br>**Corresponding structure:** (none), indefinite. | No construction necessary. This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>**Function:** "detect signals on the cable interface" / "detect a voltage value on the power bus" / "detect signals on the control bus"<br><br>**Corresponding structure:** (see patent citations in Appx. A). |

"Logic to detect signals on the cable interface" is an element of the "transmitting device"

of claim 10 and comprises two logics: "a first logic to detect a voltage on the power bus" and "a second logic to detect signals on the control bus." The '231 Patent discloses no structure adequate to perform these "detect[ing]" functions. Ex. 8, ¶¶ 201-250.

Aside from the boilerplate discussed above, UCT's citations fall into three categories. First, UCT cites excerpts stating that the "transmitter" or "transmitting device" detects a signal or voltage. Ex. 8, ¶¶ 209-211, 230-232. But these cannot be the "logic to detect" at least because the "transmitter" is a separately-recited structural element of claim 10 and the "transmitting device" is the entire claimed apparatus, which includes the "logic[s] to detect" as separate elements. *See Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1366 (Fed. Cir. 2008) (structure that includes recited "means" cannot itself be the means); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("[D]ifferent claim terms are presumed to have different meanings."). Nothing described as a "transmitter" or "transmitting device" in the patent could be the corresponding structure. Ex. 8, ¶¶ 216-222, 237-242. At most, these excerpts merely imply that some ***unidentified*** structure within the entire claimed device performs the function of the "logic[s] to detect"—that is, the specifications add nothing to the insufficient structural recitation in the claims themselves. *Id.*, ¶¶ 217, 221, 238, 241.

Second, several excerpts refer to the "HDMI-M transmitter chip 812." *Id.*, ¶¶ 209-211, 230-232. But UCT told the Lenovo court that the "transmitter chip" is ***not*** the structure corresponding to these disputed terms. Ex. 15 at 55:11 – 56:18. Instead, UCT argued that the "logic to detect" is "its own physical hardware" that "links to the structure of [the transmitter and receiver] chips." *Id.* at 56:6-18. The '231 Patent does not, however, describe or illustrate any "logic[s] to detect" that have their own physical hardware and that link to the transmitter chip; at most, the patent implies that the transmitter chip may "include" logic to detect, which is insufficient to describe structure.

Ex. 5 at 8:55-59; Ex. 8, ¶¶ 223-225, 243-247; *Egenera*, 972 F.3d at 1374 ("Mere inclusion of a limitation within a structure does not automatically render the limitation itself sufficiently structural."). Although the '231 Patent (in Fig. 8) illustrates a few internal components of the HDMI-M transmitter chip, none are adequate to perform the claimed detecting functions and, when asked, UCT was unable to identify any of these components as structure corresponding to either claimed "logic to detect." Ex. 8, ¶¶ 224, 244; Ex. 15 at 53:11 – 56:23 (for example: "I don't know that I can give you like a box drawing exercise and show you specifically, you know, where that would be located"). And because "HDMI-M" appears to have been coined in the '231 Patent, "HDMI-M transmitter chip" is not a structure that would have been known to a POSITA at the time. Ex. 8, ¶¶ 224, 244.

Finally, UCT cites several excerpts that merely restate the claimed function. Ex. 8, ¶¶ 215, 236 (addressing 2:7-10 ("a predetermined voltage ***is detected***"), 2:10-15 ("a value of the signal pulse ***is detected***"), 7:59-62 ("a low signal ***is detected*** on the CBUS"), and 3:22-26 ("a transmitting device . . . include[s] logic to detect")). Such "purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1316–17 (Fed. Cir. 2012). There is certainly no disclosure of the kind of step-by-step algorithm required for a computer-implemented logic. *Aristocrat Techs. Australia Pty Ltd. v. Intern. Game Tech.*, 521 F. 3d 1328, 1334–38 (Fed. Cir. 2008) (stepwise algorithm required); Ex. 8, ¶¶ 208, 229.

b. **"logic to discover" / "logic to detect" terms ('231 Patent, claim 16 and dependents)**

| Term | Defendants | Plaintiff |
|---|---|---|
| **"logic to discover a transmitting device coupled with the receiving device"** / **"a first logic to detect a first signal on the control bus…"** / **"a second logic to detect a power signal from the transmitting device…"** | Means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** (agreed)<br><br>**Corresponding structure:** (none), indefinite. | No construction necessary. This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>**Function:** "discover a transmitting device coupled with the receiving device" / "detect a first signal on the control bus" / "detect a first signal on the control bus"<br><br>**Corresponding structure:** (see patent citations in Appx. A). |

"Logic to discover a transmitting device coupled with the receiving device" is an element of the "receiving device" of claim 16 and comprises two "logic[s] to detect:" "a first logic to detect a first signal on the control bus" and "a second logic to detect a power signal from the receiving device." The '231 Patent does not describe any structure adequate to perform these "discover[ing]" / "detect[ing]" functions, for essentially the same reasons as the "logic to detect" limitations of claim 10. Ex. 8, ¶¶ 251-305. Some of UCT's excerpts refer to a "receiver" (which cannot be the "logic" because it is recited as a separate element of claim 16) or a "receiving device" (which cannot be the "logic" because it is the entire apparatus claimed in claim 16). *Id.*, ¶¶ 269-274, 291-297; *Net MoneyIN*, 545 F.3d at 1366; *Helmsderfer*, 527 F.3d at 1382. Others refer to the "HDMI-E receiver chip 832." As with claim 10: UCT told the LGL court that the "logic[s]" of claim 16 are ***not*** the receiver chip but are separate hardware; the patent implies the logics are internal to the receiver chip (rather than separate) but none of the components shown internal to the receiver chip could perform the recited functions; UCT was unable to identify any of these internal components as structure for the claimed "logic[s];" and because "HDMI-E" appears to have been coined in the '231 Patent, "HDMI-E receiver chip" would not have described known structures. Ex. 15 at 55:11-

56:18; Ex. 8, ¶¶ 275-279, 298-302; Ex. 5 at 8:55-59. The remainder of UCT's excerpts are, at best, insufficient repetition of the claimed function. Ex. 8, ¶¶ 268, 289-290 (addressing Abstract ("a signal from a transmitting device *is detected*"), 1:62-65 ("a signal from a transmitting device *is detected* on the control bus"), 1:65 – 2:3 ("a predetermined voltage signal *is received*")); *Noah*, 675 F.3d at 1316–17. The specification never discloses a stepwise algorithm for these "detecting" functions. *Aristocrat*, 521 F. 3d at 1334–38; Ex. 8, ¶¶ 260, 281.

### c. "logic to convert" ('520 Patent, claims 12, 19, and dependents)

| Term | Dell | UCT |
|---|---|---|
| **"logic to convert each of one or more control signals into a data packet" (claim 12)** / **"logic to convert each of the one or more data packets into a control signal" (claim 19)** | Means-plus-function limitations under 35 U.S.C. § 112(6).<br><br>**Function: (agreed)**.<br><br>**Corresponding structure:** (none), indefinite. | No construction necessary. This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>**Function:** "convert each of one or more control signals into a data packet" (claim 12) / "convert each of the one or more data packets into a control signal" (claim 19)<br><br>**Corresponding structure:** (see patent citations in Appx. A). |

The '520 Patent does not describe any *structure* to convert control signals to data packets (claim 12) or data packets to control signals (claim 19), rendering these terms indefinite. Ex. 8, ¶¶ 130-135; *see also* 136-155. At most, as to claim 12, the specification repeats the claimed *function* of converting control signals into a data packet, without bothering to link this function to any structure at all. *Id.*, ¶¶ 144-152 (addressing UCT's cited excerpts, including '520 Patent, 1:65–2:1 ("signals *are converted* to one or more data packets"); 3:34–37 ("standard control commands and data *are converted* into data packets"); 7:28–38 ("control signals *are converted* from bytes of data to data packets"); Fig. 2 at block 214 ("*convert* control signal")). To the extent UCT alleges these excerpts disclose a software algorithm performed by a computer, they are insufficient. *Aristocrat*,

521 F. 3d at 1334–38 (stepwise algorithm required); *Noah*, 675 F.3d at 1316–17; Ex. 8, ¶ 155; Ex. 21 at 113:9-114:7 (failing to identify specific steps of an algorithm). UCT's cited reference to multiplexing control signals at 7:28–38 is insufficient for the additional reason that the patent teaches that multiplexing and converting are different functions. *Id*. at Fig. 2 (box 210 "Multiplex multiple control signals" and box 214 "Convert control signal . . . into data packet"); Ex. 8, ¶¶ 133, 147. As to claim 19, the specification never even mentions the claimed ***function*** of converting data packets into control signals (much less any ***structure*** that does so).

### d.  "logic to arbitrate" ('520 Patent, claims 12, 19, and dependents)

| Term | Dell | UCT |
|---|---|---|
| **"logic to arbitrate use of the first control bus, the logic to arbitrate use being operable to: determine whether the control bus is in use by the receiving [transmitting] device, and if the first control bus is not in use by the receiving [transmitting] device, conduct arbitration for control of the first control bus"** | Means-plus-function limitations under 35 U.S.C. § 112(6).<br><br>**Function:** (agreed)<br><br>**Corresponding structure:** (none/inadequate) indefinite. | No construction necessary. This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>**Function:** "arbitrate use of the first control bus by determining whether the control bus is in use by the receiving device [/ transmitting device], and if the first control bus is not in use by the receiving device [/ transmitting device], conducting arbitration for control of the first control bus"<br><br>**Corresponding structure:** (see patent citations in Appx. A). |

UCT is vague about what it contends is the structure corresponding to the claimed "logic[s] to arbitrate," but its most recent claim construction filing focused on Figure 3 and three excerpts that describe it.[3] Ex. 24 at 7 (citing Fig. 3, 5:1-67, 7:17-28, and 7:48 – 8:12). These excerpts may, at most, describe an algorithm to arbitrate, but not any structure to perform that function.[4]

---

[3] The remaining excerpts cited by UCT in its disclosures are insufficient. Ex. 8, ¶¶ 167-191.

[4] At best, these excerpts attribute "arbitration" to the "transmitting device" and "receiving device"

The Federal Circuit found disclosure of an algorithm sufficient to support a means-plus-function term where "the disclosed structure is a computer, or microprocessor, programmed to carry out [the] algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). But this rule is unique to functions implemented in software. *See id.* at 1348 ("[A] general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software"). Dell is unaware of a case in which an algorithm was sufficient structure for a means-plus-function term limited to hardware such as a logic circuit, and the Federal Circuit has clarified that the reasoning of *WMS Gaming* "does not apply to functions implemented through circuitry." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1267 (Fed. Cir. 2021). Thus, if the structure corresponding to "logic to arbitrate" could be logic circuit hardware alone,[5] the disclosure of an algorithm to arbitrate is insufficient and the term is indefinite. *C.f. id.*

If, on the other hand, the Court determines the cited algorithms are sufficient structure for the "logic to arbitrate," then that term must be construed as a computer programmed with software to carry out the arbitration algorithm of, *e.g.*, Fig. 3, 7:48 – 8:12, and 5:1-42. *Qualcomm*, 6 F.4th at 1267; Ex. 8, ¶¶ 188-190 (7:17-28 adds nothing to Fig. 3; 5:43-67 is unrelated to the claimed "logic to arbitrate"). Even so, the claims would ***still*** be indefinite. Ex. 8, ¶¶ 192-197. Block 306 of Fig. 3—which relates to the "determining whether the control bus is in use by the receiving device" function of the "logic to arbitrate"—allows arbitration to proceed only if "CBUS [is] idle or unused for $\geq n$ cycles." The patent explains that block 306 determines whether CBUS has been unused

---

(the entire claimed apparatus of claims 12 and 19, respectively) or the "transmitter" and "receiver" (which are recited as separate elements of claims 12 and 19, respectively).

[5] In the LGL *Markman* hearing, UCT repeatedly told the court that the claimed "logic" is exclusively hardware. Ex. 15 at 24:22 – 25:16; 39:8-14.

"for *a certain number* of cycles," indicating that "n" is a term of degree. '520 Patent at 7:54-58; *see also* 5:7-9 ("Arbitration is needed if the bus has been idle for over a certain number of cycles"). In the HP case, UCT's expert could not identify a specific value of "n" in the specification, instead testifying that he would have to "look at whatever statistics [] are collected, whatever is applicable to one of ordinary skill in the art as an appropriate number." Ex. 21 at 108:14-109:14. The bounds of "n" are therefore "purely subjective and depend[] on the unpredictable vagaries of any one person's opinion." *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (internal quotations omitted). Thus, Fig. 3 is not adequate structure under §112(6) and, additionally, a construction based on Fig. 3 would include an indefinite term of degree under §112(2).

> **B.    "a preemption component that signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet" ('905 Patent, claim 21 and dependents)**

| Dell | UCT |
|---|---|
| This term is a means-plus-function limitation under 35 U.S.C. § 112(6). | No construction necessary. |
| | This claim term does not invoke §112(6). |
| **Function:** signaling the transmission component to stop transmitting the first packet, transmitting a preempt indicator indicating that a second packet is to be transmitted, transmitting the second packet, and signaling the transmission component to continue transmitting the first packet | Alternatively, should §112(6) apply: |
| | **Function:** "signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet" |
| **Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | **Corresponding structure:** "20:3-25, Fig. 13 and 20:31-37, Fig. 14 and 20:50-67, and equivalents thereof" |

### 1.    "Preemption component that…" is means-plus-function

"Component" is a nonce word subject to means-plus-function interpretation. *See Alarm.com, Inc. v. SecureNet Techs., LLC*, No. 15-cv-807-RGA, 2019 WL 3996883, at *5–6 (D. Del. Aug. 23, 2019) ("While the claim term does not use the words 'means,' the word 'component' is a 'nonce' or non-structural word under § 2181 of the Manual of Patent Examining Procedure."); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910-LMB, 2018 WL 1699429, at *19–20 (E.D. Va. Apr. 6, 2018) (substantively same); *Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F. Supp. 3d 586, 621–22 (E.D. Tex. 2019) (substantively same). In fact, the USPTO itself lists "component" as an exemplary "non-structural generic placeholder" that can invoke means-plus-function analysis. Ex. 9 at § 2181(I)(A) (listing "component for" as a "non-structural generic placeholder[]").

The modifier "preemption" does not change that conclusion. It merely restates the ***function*** of the "component" (*e.g.*, "transmits a preempt indicator"), not ***structure***. *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014) (prefixes "program recognition" and "program loading" "do nothing more than identify functions for the 'device' to perform"); *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021) ("the prefix 'user identification'" does not "impart structure because it merely describes the function of the module: to identify a user," so "the claim language fails to provide any structure for performing the claimed functions."); *Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377, 1382 (Fed. Cir. 2025) (prefix "payment" in the term "payment handler" "merely describes the function of the handler"); *see also* Ex. 8, ¶ 52. The '905 Patent specification also fails to provide any sufficiently definite structure for the "preemption component." In fact, the term does not appear ***anywhere*** in the '905 Patent outside of claim 21. *See, e.g.*, *Rain*, 989 F.3d at 1006 (patent specification "does not impart any structural significance" to term "user identification module" because "it does not

even mention a 'user identification module'"); Ex. 8, ¶ 53.

At the time of the alleged invention, "component" referred not to a specific structure but to any part (hardware, software, or a combination of both) of a larger structure that performs a function. Ex. 8, ¶ 51, 54; *e.g.*, Ex. 10 at 204 ("component" is "[o]ne of the parts that make up a system" and "may be hardware or software"); Ex. 11 at 127 ("component" is "[h]ardware or software that is part of a functional unit"); Ex. 17 at 116. "Preemption component" is thus a black box—that is, anything that can perform the recited function. Because no other language in the claim recites sufficient structure, "preemption component" is a means-plus-function term under § 112, ¶ 6. Ex. 8, ¶ 55.

### 2. The '905 Patent does not disclose adequate corresponding structure and, thus, "preemption component…" is indefinite

The parties do not dispute the function recited by this element. The '905 Patent, however, does not identify any structure (much less an ***adequate*** structure) to perform this function—indeed, it does not even use the term "preemption component." *See* '905 Patent at 19:61–21:20.

UCT also has not identified any specific structure, opting instead to string cite various passages from the '905 Patent. Ex. 12 at 2 ("20:3–25, Fig. 13 and 20:31–37, Fig. 14 and 20:50–67"). But ***none*** of these passages describe structure corresponding to the preemption component. The passage at 20:3-25 merely describes a preemption ***process*** that is split between two different "layers" of a network model—the link and transport layers. UCT does not specify which of these layers it believes is the "preemption component." While these layers may include "transmit components" and "receive components" ('905 Patent, 9:8–11), no "preemption component" is ever identified. Moreover, the specification never mentions a single "component"—let alone describes its corresponding structure—that performs all of the "preemption component" functions recited in claim 21. Ex. 8, ¶ 62-64. Moreover, the network model and its layers are abstractions and

functionally defined, and thus do not connote any specific structure to a POSITA. *Id.,* ¶ 58-60. Fig. 13 merely shows the symbols and packets sent as a result of preemption, not any structure that performs the claimed functions. *Id.,* ¶ 65. The only structure described in 20:31–37 is a "communications node." But because this corresponds to the entire claimed "communications device" of Claim 21, of which the preemption component is only one part, this disclosure at most indicates that some unidentified structure within the entire claimed device performs the function (which adds nothing to the insufficient recitation in the claim itself). *Id.* Fig. 14 is a flowchart that describes only certain steps of preemption but does not disclose any structure to implement those steps. *Id.,* ¶ 66. And 20:50–67 merely states that a "component" performs certain claimed preemption functions, thus offering no clarity beyond the insufficient nonce word found in the claim. *See* Ex. 1 at 20:40-55; Ex. 8, ¶ 67.

Because "preemption component" is a means-plus-function element but the '905 Patent does not disclose adequate structure for performing the recited functions, this claim limitation is indefinite. *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

C.      **"an identification component that identifies a packet type of a packet of symbols" ('798 Patent, claim 19 and dependents)**

| Defendants | Plaintiff |
|---|---|
| This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Identifying a packet type of a packet of symbols<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>**Function:** "identifies a packet type of a packet of symbols"<br><br>**Corresponding structure:** "8:31-33, 9:12-22, 15:4-8, 15:12-14, Fig. 10 and 18:46-57, Fig. 11 and 18:58-19:10, and equivalents thereof" |

### 1. "Identification component that…" is means-plus-function

As discussed above, "component" is a means-plus-function nonce word. The modifier "identification" does not alter that conclusion. "Identification component" is not a term of art that a POSITA would recognize as connoting specific structure. Ex. 8, ¶ 69-76. And "identification" is merely shorthand for the component's recited function: "identif[ying] a packet type of a packet of symbols." Nothing else in this element recites structure to perform the identifying function. The specification also fails to provide any sufficiently definite structure for the claimed "identification component," as the term does not appear anywhere in the '798 Patent outside the claims. "Identification component" is therefore a black box term subject to means-plus-function interpretation under § 112, ¶ 6.

### 2. The '798 Patent does not disclose adequate corresponding structure and, thus, "identification component…" is indefinite

The parties do not dispute the corresponding function, which is to "identif[y] a packet type of a packet of symbols." But the '798 Patent does not identify any (much less ***adequate***) structure to perform that function of identifying a packet type of a packet of symbols in the claimed communications device. At most, the '798 Patent echoes the insufficient "black box" recitation in the claim, stating that a "component of the transport layer" may "determine the type of the packet." '798 Patent at 18:61–19:2.

UCT does not identify a specific corresponding structure, but merely cites to various '798 Patent excerpts that are either irrelevant or merely repeat the claimed function with no corresponding structure. *See*, *e.g.*, Ex. 12 at 3. None describes adequate structure for performing the recited functions. Ex. 8, ¶ 77. At most, the specification describes only that a "transport layer" of a "communications node" may perform certain functions. *Id.*, ¶ 78; *see* Ex. 3 at 14:32–49. And while the transport layer may include "transmit components" (Ex. 3 at 9:1-8), no "identification

component" is identified. Ex. 8, ¶ 79. In fact, the specification does not identify any "component" in particular—let alone its corresponding structure—that performs the functions recited in claim 19. *Id.*, ¶ 80.

Most of UCT's citations merely describe function, and many have no relation to the specific function of this limitation (identifying a ***packet type*** of a packet of symbols). *Id.*, ¶¶ 81, 84-85 (discussing purely functional disclosure at 8:31-33, Fig. 10 and 18:46–57, and Fig. 11 and 18:58–19:10). The "receive controller" (9:12–22), for example, is described in purely functional terms and illustrated as a "black box" in Figure 2, is related to receiving (and thus cannot be the "identification component," which is part of a "device for ***transmitting***"), and merely identifies a packet, not a packet ***type***, as recited in this limitation. *Id.*, ¶ 82; Ex. 3 at Claim 19. 15:4-8 and 15:12-14 describe the transport layer signaling to the link layer that a control packet will be transmitted but say nothing about the recited function (identifying a packet type of a packet of symbols). Ex. 8, ¶ 83.

Because the '798 Patent does not disclose adequate structure for performing the functions assigned to the means-plus-function "identification component" of Claim 19, this claim limitation is indefinite. *Ibormeith*, 732 F.3d at 1379.

### D.    "application data and control bits" ('307 Patent, all asserted claims)

| Dell | UCT |
|---|---|
| The application data and control bits are not encoded as special characters. | No construction necessary. |

All asserted claims recite "application data and control bits" that are (or have been) encoded and transmitted over a link. The intrinsic record requires that application data and control bits cannot be encoded in the form of "special characters." This is relevant because UCT alleges that Dell products encode application data and/or control bits as "K-codes," special characters

described in a 1980s-era patent that is cited on the face of the '307 Patent.[6]

      The specification emphasizes that special characters are different than and distinguishable from encoded application data and control bits. For example, the patent explains that the invention generates "encoded data in accordance with a line code . . . where the line code specifies a block code for **encoding cells (including application data and control bits)** and typically also specifies **special characters that are distinguishable from bit sequences of encoded cells**." '307 Patent at 8:38-48 (emphasis added); *see also id.* at 8:48-59, 8:60-67 (same). The specification repeatedly explains that special characters are distinct from encoded cells of application data and control bits:

> Preferably, the code words employed to encode cells and the special characters are chosen such that **no special character can unintentionally occur in a sequence of code words indicative of a cell** (i.e., no special character matches any of the code words, and no sequence of bits from any possible sequence of consecutively transmitted code words matches any of the special characters).

*Id.* at 5:15-28 (emphasis added); *see also id.* at 16:39-43 and 10:55-62 (similar), 10:4-9 (special characters "are not indicative of application data"). Indeed, the '307 Patent states several times that the different treatment of special characters versus encoded application data and control bits is an advantageous feature of "the invention:"

> Transmission of code word sequences indicative of cells (and special characters that are distinguishable from the bit sequences that can occur in such code word sequences) **in accordance with the invention** allows transmitters and receivers to implement multiple levels (layers) of communication protocol functionality in an improved manner

*Id.* at 18:30-35 (emphasis added), 48:1-6, 48:27-32, and 18:45-52. Such language in the specification limits the claims. *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (claims construed to require feature that specification repeatedly described

---

[6] U.S. Patent No. 4,486,739 to Franaszek et al., which is cited on the face of the '307 Patent, describes an encoding scheme known as 8b/10b that included "special characters" that are often called "K-codes." *See* Ex. 13 at 8:46 – 9:36 and Table III.

as advantageous part of "the present invention").

The prosecution history further confirms that the claimed application data and control bits cannot be encoded as special characters. In response to a petition for *inter partes* review, UCT distinguished prior art on the basis that it did not teach "encoding *both* application data *and* control bits together." Ex. 14 at 1-2 (emphasis in original). In the '307 Patent, by contrast, "input words indicative of application data and control bits" are encoded "into a sequence of code words" but "special characters" are "distinguished from [and] are not encoded with the codewords." *Id.* at 3; *see also id.* at 25 ("The '307 Patent explains that the line code 'also specifies special characters that are distinguishable from bits of the encoded cell.'"). These arguments by UCT in an IPR limit the claims. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361–64 (Fed. Cir. 2017).

**E.**    **"AV sink operation mode" and "AV source operation mode" ('265 Patent, all claims)**

| Term | Defendants | Plaintiff |
|------|------------|-----------|
| **AV sink operation mode** | A mode in which the AV device receives (but does not provide) power and receives (but does not send) data. | No construction necessary. |
| **AV source operation mode** | A mode in which the AV device provides (but does not receive) power and sends (but does not receive) data. | No construction necessary. |

These terms recite mutually exclusive modes—in sink mode, the device **receives** power and data; in source mode, it **provides** power and **sends** data. This is evident from the language of the claims, which recite that a device in AV sink operation mode "receive[s] AV data" and "receive[s] power," whereas the device in AV source operation mode "send[s] AV data" and "provide[s] a . . . supply voltage." *E.g.,* Ex. 7 at Claim 8.

The specification confirms this plain meaning. For example, the patent explains that a device in AV sink operation mode is a "sink for receiving AV information from another AV device," while a device in AV source operation mode is "a source for providing AV information

to another AV device." *Id.* at 2:26–31. The patent clarifies that these are mutually exclusive modes, teaching that a device in AV sink operation mode may "receive power from a first supply voltage provided via a channel of the connector," while, "[b]y ***contrast***," a device in AV source operation mode may "provide a second supply voltage at the channel of the connector." *Id*. at 5:46–54 (emphasis added). The patent also explains ***why*** two connected devices cannot both provide power or send data at the same time: it could damage the devices. *Id*. at 4:1–11 ("[C]onnecting of AV Source devices to one another can risk damage to transmission hardware in either or both devices" by attempting to drive either power or data in opposite directions via the same channel), 3:13–22 (in "[c]ertain embodiments . . . an AV device will, by default, return to or otherwise be in a Sink mode" until it can "determine . . . that it is connected to an AV Sink device," at which point it "may safely transition to an AV Source Operation mode."), 10:21–24 (a device may remain in AV source mode "until a test . . . indicates that the detected AV Sink device is no longer providing a HPD Signal. If such an HPD signal is no longer detected, method 400*b* may begin to protect the AV device from possible harm—e.g. caused by the detected AV Sink device somehow transitioning to AV Source operation.").

The specification thus teaches that a device may only provide power and/or send data when operating in "AV source operation mode" and that it may do so only when connected to a device operating in "AV sink operation mode" which, to avoid damaging the device, ***cannot*** provide power or send data. *See, e.g.*, *Seiko Epson Corp. v. Coretronic Corp.*, 376 F. App'x 23, 25 (Fed. Cir. 2010) (a claim construction must be consistent with the "thrust" of the invention). That is, as reflected in Dell's construction, a device in "AV sink operation mode" receives (but does not provide) power and receives (but does not send) data; and because a device can operate in "AV source operation mode" only when connected to a device in "AV sink operation mode" (which

does not provide power or send data), a device in "AV source operation mode" provides (but does not receive) power and sends (but does not receive) data.

      F.     "mobile device" ('520 Patent, all claims and '231 Patent, claim 14)

| Defendants | Plaintiff |
|---|---|
| A cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other similar devices (i.e. portable devices smaller than a standard device such as a personal computer or monitor). | Any mobile electronic device |

UCT's construction is self-referential and does not resolve the dispute. Dell's construction, on the other hand, reflects lexicographic statements that exclude monitors and personal computers ("PCs") from "mobile device." Specifically, the patents define "mobile device" as "any mobile electronic device [] *includ[ing]* a cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other similar devices." Ex. 4 at 2:36-40 and Ex. 5 at 2:50-54; *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) (where "patentee has clearly defined a claim term, that definition usually is dispositive; it is the single best guide to the meaning of a disputed term") (cleaned up). Notably, the list does ***not*** include PCs, which were in widespread use in 2008. This is because the '520 Patent proposes a new compact interface (HDMI-M) for mobile devices, which—unlike PCs—are too small for a standard interface (e.g. standard HDMI). Ex. 4 at 1:40-50 and Ex. 5 at 1:45-54 (aim of the invention to allow smaller interfaces for smaller-than-standard devices); Ex. 25 at 138 (2006 Dell laptop had multiple USB and other ports); Ex. 26 at 14-16 (similar); Ex. 27 at 3 (similar). Indeed, the patents mention PCs only once, and only to distinguish them from "portable devices." Ex. 4 at 2:61-3:2 and Ex. 5 at 3:3-12 ("The HDMI-M device may . . . utiliz[e] USB-OTG [], a standard for portable devices that allows dual-mode operation in which a device may be connected to a personal computer ***or*** to another portable device") (emphasis added)). The patents also state that monitors are "standard," rather than mobile,

devices. Ex. 4 at 2:56-59, Ex. 5 at 2:65-3:1. The applicant for the patents (Silicon Image, Inc.) also distinguished between "mobile devices" and PCs in SEC filings, which are extrinsic evidence. *See, e.g.,* Ex. 34 at 3 (distinguishing between "consumer electronics (CE), mobile, and personal computer (PC) markets."), 7 (distinguishing between "mobile and PC applications") and 8 (similar). A POSITA would thus understand that "mobile device" refers to portable devices that are too small for standard interfaces (and that are smaller than monitors and PCs), as proposed by Dell.

### G.    "standard protocol" / "modified protocol" ('520 Patent, all claims)

| Term | Defendants | Plaintiff |
|------|------------|-----------|
| **Standard protocol** | A communication protocol that was standardized as of the January 4, 2008 filing date of the '520 Patent. A device utilizing the standard protocol communicates over multiple control buses. | No construction necessary. |
| **Modified protocol** | A communication protocol that is a modification of the standard protocol, and that was defined as of the January 4, 2008 filing date of the '520 Patent. A device utilizing the modified protocol communicates over one (and only one) control bus. | No construction necessary. |

These phrases raise two disputes. First, claims referencing "standard" protocols have an "implicit time-dependence" and are thus limited to protocols existing at the time of the alleged invention. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("standard" limited to "technologies existing at the time of the invention"); *see also Uniloc USA, Inc. v. Apple, Inc.*, No. 19-cv-1692-EJD, 2021 WL 432183, at *8 (N.D. Cal. Jan. 15, 2021) ("Bluetooth messaging" and "Bluetooth protocols" limited to Bluetooth specification "as it existed at the time of the claimed invention"). Absent a date restriction, what qualifies as "standard"—or a modification to "standard"—would improperly change over time. *Halliburton Energy Svcs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254–55 (Fed. Cir. 2008) (claim indefinite when a product infringes sometimes but not others). Because a "claim cannot have different meanings at different times,"

the terms must be given their meaning as of the filing date. *PC Connector*, 406 F.3d at 1363.

Second, and independent from the date limitation, the intrinsic record requires that a standard protocol device communicates over multiple control buses while a modified protocol device communicates over one (and only one) control bus. The '520 Patent specification discloses a compact connector for mobile devices ("HDMI-M") that uses fewer wires, and is thus smaller, than a standard HDMI connector. Ex. 4 at 8:53-67 ("the HDMI-M cable may utilize fewer lines because of the smaller device size, including . . . a single-bit control channel"). To accomplish this, the patent teaches that "multiple types of control signals are merged onto a ***single*** bus" in the modified protocol. *Id.* at 4:17-18, 2:45-47 (describing "merging of multiple control signals on to a ***single*** bus"), 7:25-34 ("multiple control signals are multiplexed onto ***the*** control bus"). Fig. 6 (annotated at



right) illustrates this difference. The standard protocol (HDMI) cable has two control buses (DDC and CEC), but the modified protocol (HDMI-m) cable has only one (CTL). Fig. 7 confirms this, listing multiple control bus connections for "Standard HDMI" (pins 13, 15, and 16) but only one control bus connection for HDMI-M (pin 19, "Ctrl Bus"). Indeed, the specification never discloses a standard protocol device that includes only one control bus or a modified protocol device that includes more than one control bus.

The prosecution history confirms this. In response to an IPR petition, UCT insisted that communication over either only one or multiple control buses is a defining "characteristic" of the two claimed protocols. Ex. 28 at 1-2 (stating that whereas "[t]he 'standard protocol' bears the ***characteristic*** of having ***multiple control signaling channels***, . . . [t]he 'modified protocol' device

bears the *characteristic* of communication over a *single bidirectional control bus* through which the commands for the multiple control signaling channels of the 'standard protocol,' . . . can be communicated."); *see also id.* at 7 ("[T]o establish a connection between a 'modified protocol' mobile device and a 'standard protocol' device, the '520 Patent describes 'the merging of multiple control signals on to *a single bus*, where such control signals would have utilized *multiple buses under the standard protocol*.'"); 8, 9, and 27 (referring to "the *single control bus* of the 'modified protocol.'") (emphases added throughout). UCT explained that "the independent claims reflect" this distinction. *See, e.g., id.* at 27. These repeated clear and unmistakable statements by UCT in the IPR limit the claims such that the standard protocol device must communicate over multiple control buses and the modified protocol device can communicate over one (and only one) control bus. *Aylus*, 856 F.3d at 1361–64.

H.    **"the modified protocol being a modification of the standard protocol that is not included in the standard protocol" ('520 Patent, all claims)**

| Defendants | Plaintiff |
|---|---|
| Indefinite. | No construction necessary. |

This claim phrase is indefinite at least because it requires two mutually-exclusive characteristics of the "modified protocol"—it must be **both**: (1) "a modification of the standard protocol" (i.e., is somehow based on the standard protocol); **and** (2) "not included in the standard protocol" (i.e., inherits no features of the standard protocol). Ex. 8, ¶¶ 311-315.

The phrase is also indefinite because a POSITA would not be able to determine the degree of modification it requires. *Id.*, ¶¶ 316-322. In denying *inter partes* review of the '520 Patent, the Patent Trial and Appeal Board explained that "prevailing on the 'modified protocol' issue would require proving that the [alleged modified protocol] . . . is **sufficiently 'modified'** to meet the claim." Ex. 29 at 20 (emphasis added). But the patent offers no guidance on what constitutes

"sufficient" modification and, if anything, only muddies the waters. UCT has argued that the specification discloses HDMI as the "standard protocol" and USB as the "modified protocol." Ex. 28 at 1-2. But a POSITA would not understand USB to be "a modification of" HDMI, which was developed *after* and independently from USB. Ex. 8, ¶ 317. UCT's expert in the HP case was also unable to clarify how much modification the claims require. Dr. Madisetti testified that the two protocols may "share no similarities" at all or that a single "add[ed] feature" could suffice, but he had no opinion as to whether adding a specific feature (a new connector with a different configuration) would "be enough." Ex. 21 at 61:19-62:9, 72:24-73:9, 74:2-5. He further explained that "whether the modified protocol must have any similarities to the standard protocol" "depends on the context [and] the products at issue," essentially conceding that the phrase is indefinite. *Id.* at 62:10-17; *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F. 3d 1322, 1330–31 (Fed. Cir. 2006) ("[C]laims may not be construed with reference to the accused device.").

**I.    "the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" ('231 Patent, 10 and dependents)**

| Defendants | Plaintiff |
|---|---|
| The transmitter to drive a first signal value on the control bus in regular, repeated cycles upon transitioning to the pending state | No construction necessary. |

The dispute on this phrase relates to "periodically," a term that appears only once in the entire '231 Patent—in claim 1, where it modifies how the transmitter drives "a first signal value on the control bus *periodically* upon transitioning to the pending state." "Periodic" means "occurring or recurring at regular intervals." Ex. 30 at 921. The specification applies that plain meaning, explaining that "[w]hile in [the] pending state, the transmitter repeatedly pulses the control bus high for 1 ms and tristates the control bus for 1 ms." Ex. 5 at 4:19-21, 7:44-46, 9:7-9. That is the only support for this limitation in the specification and, consistent with the plain meaning and Dell's construction, it describes the transmitter repeatedly driving the control bus at

regular intervals (e.g., pulses of 1 ms high and 1 ms tristate).

J.    "first physical channel" ('103 Patent, all claims)

| Defendants | Plaintiff |
|---|---|
| A Transition-Minimized Differential Signaling (TMDS) channel. | a physical path for transmitting electrical signals |

The '103 Patent claims recite two physical channels: a "first physical channel" for video data and USB data and a "distinct" "second physical channel" for control data. The specification exclusively describes the "first physical channel" as a "transition-minimized differential signaling (TMDS) channel." Ex. 6 at 3:60-67; *see also id.* at 4:21-43 (describing "sending packets of A/V and USB data . . . via a TMDS channel 131"), 8:29 (describing "forward and backward data sent over the TMDS channel"), 4:10-15 ("Embodiments described herein use TMDS channel 131 . . . to transmit USB data"), Fig. 5 ("a first physical channel (TMDS)"), Fig. 1.

Consistent with the specification, the Applicant limited the "first physical channel" to a TMDS channel in a telephonic interview with the Examiner during prosecution. According to the Examiner's summary of the interview, "Applicant described *the invention* as a *TMDS channel* that's transmitting video and audio data in only one direction and transmitting USB data bidirectionally at a higher bandwidth." Ex. 31 at UCT-DELL-00007219 (emphasis added). In a response filed two weeks later, Applicant acknowledged that "Examiner Unelus and Applicant's representatives discussed the subject matter of the application" and did not dispute the Examiner's summary of that discussion. *Id.* at -7227. On August 10, 2017, another interview occurred during which agreement was reached regarding the claim scope, summarized by the Examiner as follows:

> *The primary reason for allowance* of claims 1, 12, 23 and 24 in the instant application *is that prior arts do not teach a TMDS channel* that's transmitting video in only one direction and transmitting USB data bidirectionally at a higher bandwidth.

*Id.* at -7249 (emphasis added). The Examiner repeated this understanding in the Notice of

Allowability. *Id.* at -7247 ("The primary reason for allowance . . . is that prior arts do not teach a **TMDS channel** ….") (emphasis added).[7]

Applicant's argument during prosecution is a disclaimer limiting the "first physical channel" to a TMDS channel. Despite numerous opportunities to do so, Applicant never contested the Examiner's understanding and accounting of **Applicant's own** characterization of "the invention as a TMDS channel" for video and USB data. "[T]he public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest" where, as here, he "lets stand an examiner's restrictive interpretation of a claim." *TorPharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003). The Federal Circuit has consistently found disclaimer where an applicant could have "challenge[d] [the] examiner's characterization in order to avoid any chance for disclaimer, but the applicant[] . . . did not." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096–97 (Fed. Cir. 2013); *see also ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) (finding disclaimer because the prosecution history "make[s] clear that the examiner and the applicant understood that the invention requires [the disputed feature]" where the "examiner [] repeated the arguments that the patentee had presented" regarding the disputed feature and "[applicant] did not respond to this statement"); *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 554 (Fed. Cir. 2020) (disclaimer where the Examiner allowed patent "based at least in part on his understanding that the claims" included a limitation missing from the

---

[7] It is unsurprising that the applicants would limit their invention to TMDS, a technology developed by the original applicant for the '103 Patent (Silicon Image), to distinguish the cited prior art reference (*Kobayashi*), which sought to provide a "more cost effective alternative" to TMDS by using an alternative technology known as "8b/10b." Ex. 32 at 16 ("TMDS$^{TM}$" is a "[t]rademark of Silicon Image") and 11 ("The TMDS encoding information . . . must be licensed from Silicon Image."); Ex. 33 at [0005]-[0007], [0075]-[0077]; Ex. 2 at 3:62-64 (8b/10b is "an encoding algorithm, **other than** that used in a TMDS link" (emphasis added)).

prior art and the applicant "did not challenge" that understanding). As in those cases, to obtain issuance of its claims, Applicant relied on the Examiner's understanding that "the invention" was limited to a specific feature (here, a "TDMS channel"). Applicant's "failure to challenge" that understanding "amounts to a disclaimer." *See SandBox Logistics*, 813 F. Appx at 554.

### K.    "the first synchronization signal" ('103 Patent, claim 17)

| Defendants | Plaintiff |
|---|---|
| Indefinite | The Court should revise claim 17 to depend on claim 12 instead of claim 11 |

Claim 17 depends from claim 11 and requires "aligning a boundary of a symbol in a first forward unit of data of the forward units of data using ***the*** first synchronization signal." The scope of claim 17 is not reasonably certain, however, because neither it nor claim 11 recites "a first synchronization signal" to which the disputed term could refer. *In re Packard*, 751 F.3d 1307, 1310, 1314 (Fed. Cir. 2014) (affirming "Board's determination that the applied-for patent claims are invalid for failure to comply with the requirements of § 112(b)" where some terms "lacked an antecedent basis"); Ex. 8, ¶¶ 324-329. UCT concedes this by asking the Court to rewrite the claims. But that would be improper, because UCT's proposal would modify the claim scope by adding all limitations of claim 12 to claim 17 and UCT cannot "demonstrate[] that a skilled artisan would have read its proposed language into the claim." *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339–40 (Fed. Cir. 2011) (a court "may not redraft claims, whether to make them operable or to sustain their validity"). Moreover, claims 12 and 17 each recite "***a*** first forward unit of data," further indicating that claim 17 was never intended to depend from claim 12—otherwise, claim 17 would refer to "***the*** first forward unit of data" instead of "***a*** first forward unit of data." *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). And because claims 13-16 each depend from claim 12, any of those claims could provide the missing antecedent basis, making UCT's choice of claim 12 arbitrary. Ex. 8, ¶ 327.

Dated: August 29, 2025                            Respectfully submitted,

By: /s/ *Kevin J. Meek*
Kevin J. Meek
Texas State Bar No. 13899600
Syed Fareed
Texas State Bar No. 24065216
Brian Oaks (pro hac vice)
Texas State Bar No. 24007767
Nick Schuneman
Texas State Bar No. 24056283
**MCDERMOTT WILL & EMERY LLP**
300 Colorado Street, Suite 2200
Austin, Texas 78701-4078
Telephone: (512) 726-2579
Facsimile: (512) 532-0002
kmeek@mwe.com
sfareed@mwe.com
boaks@mwe.com
nschuneman@mwe.com

***Attorneys for Defendants Dell Technologies
Inc. and Dell Inc.***

# APPENDIX A

**Appendix A-1: Agreed Constructions**

The parties have agreed to the following constructions:

| Patent | Claim term | Agreed Construction |
|---|---|---|
| '798 Patent | "synchronization symbol" | "a symbol for coordinating events that is separate from the corresponding packet itself" |
| '798 and '905 Patents | "in-band symbol" | "a symbol normally appearing in a packet" |
| '798 and '905 Patents | "out-of-band symbol" | "a symbol not normally appearing in a packet" |
| '103 Patent | "non-transitory computer readable storage medium storing instructions representing a digital design of a circuit comprising" | The preamble is limiting. |

## Appendix A-2: The Parties' Constructions of Disputed Briefed Terms

The following tables list the disputed terms addressed in the briefing, identify the asserted claims in which each disputed term appears (either explicitly or, for dependent claims, by inheritance from a claim on which it depends), and the parties' respective constructions.

**'905 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "a preemption component that signals the transmission component to stop transmitting the first packet, transmits a preempt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 21 (and dependent claims 22, 23, 26) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** signaling the transmission component to stop transmitting the first packet, transmitting a preempt indicator indicating that a second packet is to be transmitted, transmitting the second packet, and signaling the transmission component to continue transmitting the first packet<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary. [1]<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "signals the transmission component to stop transmitting the first packet, transmits a pre-empt indicator indicating that a second packet is to be transmitted, transmits the second packet, and signals the transmission component to continue transmitting the first packet"<br><br>Corresponding structure: "20:3-25, Fig. 13 and 20:31-37, Fig. 14 and 20:50-67, and equivalents thereof" |

---

[1] For terms/phrases where UCT has indicated that no construction is necessary, UCT contends that either no construction is necessary or the term should be construed according to its plain and ordinary meaning. UCT reserves the right to propose constructions for these terms/phrases after reviewing Dell's briefing and supporting evidence.

**'307 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "application data and control bits" | All asserted claims (appears specifically in, e.g., claims 1, 23, 53, 68) | The application data and control bits are not encoded as special characters. | No construction necessary. |

**'798 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "an identification component that identifies a packet type of a packet of symbols"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 19 (and dependent claims 20-26, 28) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Identifying a packet type of a packet of symbols<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "identifies a packet type of a packet of symbols"<br><br>Corresponding structure: "8:31-33, 9:12-22, 15:4-8, 15:12-14, Fig. 10 and 18:46-57, Fig. 11 and 18:58-19:10, and equivalents thereof" |

**'265 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "AV sink operation mode" | All asserted claims (appears specifically in, e.g., claims 1, 8, 14) | A mode in which the AV device receives (but does not provide) power and receives (but does not send) data. | No construction necessary. |
| "AV source operation mode" | All asserted claims (appears specifically in, e.g., claims 1, 8, 14) | A mode in which the AV device provides (but does not receive) power and sends (but does not receive) data. | No construction necessary. |

**'520 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "logic to convert each of one or more control signals into a data packet" (claim 12) / "logic to convert each of the one or more data packets into a control signal" (claim 19) | 12 (and dependent claims 13, 15, 18); 19 (and dependent claim 25) | These terms are means-plus-function limitations under 35 U.S.C. § 112(6).<br><br>**Function:** Converting each of one or more control signals into a data packet (claim 12) / converting each of the one or more data packets into a control signal (claim 19).<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "convert each of one or more control signals into a data packet" (claim 12) / "convert each of the one or more data packets into a control signal" (claim 19)<br><br>Corresponding structure: "1:65-2:1, 3:34-37, 7:28-38, 10:3-10, Fig. 2 (214), 7:42-47, and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "logic to arbitrate use of the first control bus, the logic to arbitrate use being operable to:<br><br>determine whether the control bus is in use by the receiving device, and<br><br>if the first control bus is not in use by the receiving device, conduct arbitration for control of the first control bus" (claim 12) /<br><br>"logic to arbitrate use of the first control bus, the logic to arbitrate use being operable to:<br><br>determine whether the control bus is in use by the transmitting device, and<br><br>if the first control bus is not in use by the transmitting device, conduct arbitration for control of the first control bus" (claim 19)<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 12 (and dependent claims 13, 15, 18); 19 (and dependent claim 25) | These terms are means-plus-function limitations under 35 U.S.C. § 112(6).<br><br>**Function (claims 12 and 19):** arbitrate use of the first control bus by determining whether the control bus is in use by the receiving device [/ transmitting device] and, if the first control bus is not in use by the receiving device [/ transmitting device], conducting arbitration for control of the first control bus.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function (claims 12 and 19): "arbitrate use of the first control bus by determining whether the control bus is in use by the receiving device [/ transmitting device] and, if the first control bus is not in use by the receiving device [/ transmitting device], conducting arbitration for control of the first control bus"<br><br>Corresponding structure: "Fig. 2 (206), Fig. 3, 3:53-55, 4:60-67, 5:1-67, 7:17-28, 7:48-8:12, 8:37-39, 10:3-10, and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "mobile device" | All asserted claims (appears specifically in, e.g., claims 1, 12, 19) | a cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other similar devices (i.e. portable devices smaller than a standard device such as a personal computer or monitor). | "any mobile electronic device" |
| "standard protocol" | All asserted claims (appears specifically in, e.g., claims 1, 12, 19) | A communication protocol that was standardized as of the January 4, 2008 filing date of the '520 patent. A device utilizing the standard protocol communicates over multiple control buses.<br><br>In the alternative, indefinite. | No construction necessary. |
| "modified protocol" | All asserted claims (appears specifically in, e.g., claims 1, 12, 19) | A communication protocol that is a modification of the standard protocol, that was defined as of the January 4, 2008 filing date of the '520 patent. A device utilizing the modified protocol communicates over one (and only one) control bus.<br><br>In the alternative, indefinite. | No construction necessary. |
| "the modified protocol being a modification of the standard protocol that is not included in the standard protocol" | All asserted claims (appears specifically in claims 1, 12, 19) | Indefinite | No construction necessary. |

**'231 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "logic to detect signals on the cable interface"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 10 (and dependent claims 11-14) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Detecting signals on the cable interface.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "detect signals on the cable interface"<br><br>Corresponding structure: "2:7-10, 3:24-26, 4:13-16, 6:36-39, 7:38-44, 8:25-27, 8:55-59, 8:67-9:3, 10:35-42, Fig. 7 (706), Fig. 8 (812), 2:10-15, 3:22-24, 4:31-33, 7:47-53, 7:59-62, 8:31-36, 8:55-58, 9:20-22, 10:35-42, Fig. 7 (712), and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "a first logic to detect a voltage value on the power bus…"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 10 (and dependent claims 11-14) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Detecting a voltage value on the power bus.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "detect a voltage value on the power bus"<br><br>Corresponding structure: "2:7-10, 3:24-26, 4:13-16, 6:36-39, 7:38-44, 8:25-27, 8:55-59, 8:67-9:3, 10:35-42, Fig. 7 (706), Fig. 8 (812), and equivalents thereof" |
| "a second logic to detect signals on the control bus…"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 10 (and dependent claims 11-14) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Detecting signals on the control bus.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "detect signals on the control bus"<br><br>Corresponding structure: "2:10-15, 3:22-24, 4:31-33, 7:47-53, 7:59-62, 8:31-36, 8:55-58, 9:20-22, 10:35-42, Fig. 7 (712), Fig. 8 (812), and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "logic to discover a transmitting device coupled with the receiving device"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 16 (and dependent claims 17, 18) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Discovering a transmitting device coupled with the receiving device.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "discover a transmitting device coupled with the receiving device"<br><br>Corresponding structure: "Abstract, 1:62-65, 3:22-24, 4:24-30, 4:40-42, 7:4-9, 8:27-31, 8:55-58, 9:13-19, 10:35-42, Fig. 7 (710), Fig. 8 (832), 1:65-2:3, 3:24-26, 6:54-7:3, 7:17-21, 8:9-19, 8:55-59, 10:35-42, and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "a first logic to detect a first signal on the control bus…"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 16 (and dependent claims 17, 18) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Detecting a first signal on the control bus.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "detect a first signal on the control bus"<br><br>Corresponding structure: "Abstract, 1:62-65, 3:22-24, 4:24-30, 4:40-42, 7:4-9, 8:27-31, 8:55-58, 9:13-19, 10:35-42, Fig. 7 (710), Fig. 8 (832), and equivalents thereof" |
| "a second logic to detect a power signal from the transmitting device…"<br><br>**This term should be governed by 35 U.S.C. § 112(6).** | 16 (and dependent claims 17, 18) | This term is a means-plus-function limitation under 35 U.S.C. § 112(6).<br><br>**Function:** Detecting a power signal from the transmitting device.<br><br>**Corresponding structure:** Because the patent fails to disclose adequate corresponding structure, this limitation is indefinite. | No construction necessary.<br><br>This claim term does not invoke §112(6).<br><br>Alternatively, should §112(6) apply:<br><br>Function: "detect a power signal from the transmitting device"<br><br>Corresponding structure: "Abstract, 1:65-2:3, 3:24-26, 6:54-7:3, 7:17-21, 8:9-19, 8:55-59, 10:35-42, Fig. 8 (832), and equivalents thereof" |

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "mobile device" | 14 | a cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other similar devices (i.e. portable devices smaller than a standard device such as a personal computer or monitor). | "any mobile electronic device" |
| "the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" | 10 (and dependent claims 11-14) | the transmitter to drive a first signal value on the control bus in regular, repeated cycles upon transitioning to the pending state | No construction necessary. |

**'103 Patent**

| Claim Term | Asserted Claim(s) | Dell's Construction | UCT's Construction |
|---|---|---|---|
| "first physical channel" | All asserted claims (appears specifically, e.g., in 1, 11, 21, 22) | A Transition-Minimized Differential Signaling (TMDS) channel. | "a physical path for transmitting electrical signals" |
| "the first synchronization signal" | 17 | Indefinite. | The Court should revise claim 17 to depend on claim 12 instead of claim 11 |

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on August 29, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ Kevin J. Meek
Kevin J. Meek