**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| UNIVERSAL CONNECTIVITY TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> v. <br><br> DELL TECHNOLOGIES INC. and DELL INC., <br><br> Defendants. | Case No. 1:23-CV-01506-RP <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF UNIVERSAL CONNECTIVITY TECHNOLOGIES INC.'S**
**<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................1

II.  TERMS FOR CONSTRUCTION ......................................................................1

  A.  The Logic Terms ('520 and '231 Patents) ..............................................1

    1.  "logic to detect" terms ('231 Patent, claim 10 and dependents)...............1

    2.  "logic to discover" / "logic to detect" ('231 Patent, claim 16 and dependents)...............................................................................4

    3.  "logic to convert" ('520 Patent, claims 12, 19, and dependents)...............5

    4.  "logic to arbitrate" ('520 Patent, claims 12, 19, and dependents)..............8

  B.  "preemption component" ('905 Patent, claim 21 and dependents) ......................10

    1.  The '905 Patent claims detail the structural nature of the "preemption component" ........................................................11

    2.  The specification and prosecution history of the '905 Patent confirm that the "preemption component" has structural meaning.........13

    3.  The "preemption component" is not indefinite ........................................14

  C.  "an identification component" ('798 Patent, claim 19 and dependents) ..............14

  D.  "application data and control bits" ('307 Patent, all asserted claims....................17

  E.  "AV sink operation mode" and "AV source operation mode" ('265 Patent, all claims)........................................................................20

  F.  "mobile device" ('520 Patent, all claims and '231 Patent, claim 14)...................21

  G.  "standard protocol" / "modified protocol" ('520 Patent, all claims) ....................23

  H.  "the modified protocol being a modification of the standard protocol that is not included in the standard protocol" ('520 Patent, all claims)......................26

  I.  "the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" ('231 Patent, 10 and dependents)..........28

J.      "first physical channel" ('103 Patent, all claims) ...................................................28

K.      "the first synchronization signal" ('103 Patent, claim 17)....................................30

# TABLE OF AUTHORITIES

**Cases**

3M Innovative Props. Co. v. Tredegar Corp.,
  725 F.3d 1315 (Fed. Cir. 2013) ............................................................................... 19, 26

Absolute Software, Inc. v. Stealth Signal, Inc.,
  659 F.3d 1121 (Fed. Cir. 2011) ....................................................................................... 18

ACCO Brands, Inc. v. Micro Sec. Devices, Inc.,
  346 F.3d 1075 (Fed. Cir. 2003) ....................................................................................... 29

Apple Inc. v. Wi-LAN Inc.,
  25 F. 4th 960 (Fed. Cir. 2022) ............................................................................. 18, 25, 29

Biogen Idec, Inc. v. GlaxoSmithKline LLC,
  713 F.3d 1090 (Fed. Cir. 2013) ....................................................................................... 29

Cellspin Soft, Inc. v. Fitbit, Inc.,
  No. 17-CV-05928-YGR, 2021 WL 1417419 (N.D. Cal. Apr. 14, 2021).................................. 24

Dyfan, LLC v. Target Corp.,
  28 F.4th 1360 (Fed. Cir. 2022) .................................................................................. 10, 11

E2E Processing, Inc. v. Cabela's Inc.,
  No. 2:14-CV-36-JRG-RSP, 2015 WL 4051423 (E.D. Tex. July 2, 2015) ........................ 11, 13

Fractus, S.A. v. AT&T Mobility LLC,
  No. 2:18-CV-00135-JRG, 2019 WL 1641357 (E.D. Tex. Apr. 16, 2019)............................... 10

GE Lighting Sols., LLC v. AgiLight, Inc.,
  750 F.3d 1304 (Fed. Cir. 2014) ....................................................................................... 25

Inventio AG v. ThyssenKrupp Elevator Ams. Corp.,
  649 F.3d 1350 (Fed. Cir. 2011) ....................................................................................... 12

L2 Mobile Techs. LLC v. TCL Elecs. Holdings Ltd.,
  No. 1:22-CV-01306-JDW, 2024 WL 986918 (D. Del. Mar. 7, 2024) ................................... 27

Liebel-Flarsheim Co. v. Medrad, Inc.,
  358 F.3d 898 (Fed. Cir. 2004) ......................................................................................... 25

Lodsys, LLC v. Brother Int'l Corp.,
  No. 2:11-CV-00090-JRG, 2013 WL 2949959 (E.D. Tex. June 14, 2013)............................. 11

Personalized Media Commc'ns, LLC v. I.T.C.,
  161 F.3d 696 (Fed. Cir. 1998) ......................................................................................... 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 24

*Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*,
    No. 1:22-CV-973-RP, 2025 WL 2182327 (W.D. Tex. Mar. 4, 2025) ..................... 30

*Rodime PLC v. Seagate Tech., Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999) ........................................................................ 17

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005) ........................................................................ 29

*SandBox Logistics LLC v. Proppant Express Invs. LLC*,
    813 F. App'x 548 (Fed. Cir. 2020) .................................................................... 29

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017) ........................................................................ 26

*Sorensen v. Int'l Trade Comm'n*,
    427 F.3d 1375 (Fed. Cir. 2005) ........................................................................ 29

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ........................................................................ 29

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) .................................................................. 17, 29

*Universal Connectivity Techs. v. Lenovo Grp. Ltd.*,
    No. 2:23-cv-00449-JRG, (E.D. Tex. Sept. 16, 2025) ................... 1, 3, 5, 6, 8, 9, 10

*Visionix, Inc. v. United States*,
    150 Fed. Cl. 486 (Fed. Cl. 2020) ...................................................................... 17

*Vstream Techs., LLC v. PLR Holdings, LLC*,
    No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016), *report &*
    *recommendation adopted*, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016) ............... 27

*WSOU Invs., LLC v. F5 Networks, Inc.*,
    No. 2:20-CV-01878-BJR, 2022 WL 268825 (W.D. Wash. Jan. 28, 2022) ............... 27

**Statutes**

35 U.S.C. § 112 ...................................................................... 1, 4, 5, 8, 9, 10, 11, 12, 14

## I.      INTRODUCTION

Plaintiff Universal Connectivity Technologies ("UCT") submits this responsive claim construction brief.  After Dell filed its opening claim construction brief (Dkt. No. 77, "Br."), many of the disputed terms for construction were construed by Judge Payne in the co-pending action *Universal Connectivity Techs. v. Lenovo Grp. Ltd.*, No. 2:23-cv-00449-JRG, Dkt. No. 204 (E.D. Tex. Sept. 16, 2025) (the "*Lenovo* Order," attached as Ex. 1).  While UCT does not necessarily agree with all the constructions in the *Lenovo* Order, the Court should nonetheless adopt those constructions to promote consistency across cases.  Dell's arguments in this case mirror those advanced by Lenovo and do not compel a different result as to any of the already construed terms.

## II.     TERMS FOR CONSTRUCTION

### A.      The Logic Terms ('520 and '231 Patents)

The parties dispute whether certain "logic" terms (hereinafter, the "Logic Terms") are subject to 35 U.S.C. § 112(6).  *See* Br. at 3-4.  These terms were recently construed in the *Lenovo* Order.  *Lenovo* Order at 21-37.  Judge Payne held that the Logic Terms were subject to § 112 ¶ 6, but that none of the disputed terms were indefinite because the '520 and '231 Patent specification discloses sufficient structure.  *Id.*  While UCT disagrees that the Logic Terms are subject to § 112 ¶ 6, the *Lenovo* Order correctly held that each of the Logic Terms are not indefinite.  The Court should find the same here and adopt the same structures for the Logic Terms as those contained in the *Lenovo* Order.  Dell's indefiniteness arguments are unpersuasive considering the reasoning in the *Lenovo* Order and should be rejected.

### 1.      "logic to detect" terms ('231 Patent, claim 10 and dependents)

| Term | *Lenovo* Order | Dell's Proposed Construction |
|------|---------------|------------------------------|
| "first logic to detect a voltage value on the | Subject to 35 U.S.C. § 112 ¶ 6 | Subject to 35 U.S.C. § 112 ¶ 6 |

| power bus" | <u>Function:</u>  detect a voltage value on the power bus<br><br><u>Structure:</u>  a voltage detector with an input connected to the pin of the transmitter that is connected to the power bus, and equivalents thereof | <u>Function:</u> detect a voltage value on the power bus<br><br><u>Structure:</u>  Indefinite |
| "second logic to detect signals on the control bus" | <u>Function:</u>  detect signals on the control bus<br><br><u>Structure:</u>  a voltage detector with an input connected to the pin of the transmitter that is connected to the control bus, and equivalents thereof | <u>Function:</u> detect signals on the control bus<br><br><u>Structure:</u>  Indefinite |
| "logic to detect signals on the cable interface" | "detect signals on the cable interface"<br><br><u>Structure:</u> The corresponding structure is defined by the subparts of the limitation. | <u>Function:</u>  detect signals on the cable interface<br><br><u>Structure:</u>  Indefinite |

The "logic to detect" terms are not indefinite because the '231 Patent specification discloses sufficient structure.  As the *Lenovo* Order explained: "Clearly, th[e] logic must involve some hardware because it detects a voltage on a bus." *Lenovo* Order at 32.  For example, in connection with Figure 8, the '231 Patent teaches an embodiment using the "HDMI-M transmitter chip." *See* '231 Patent at 8:42 – 9:34.  The '231 Patent teaches "that transmitter chip detects the voltage." *Lenovo* Order at 32; *see also* '231 Patent at 4:13–16 ("The transmitter detects presence of a +5V power signal from the receiver on a 5V Power pin, and transitions to the pending state."), 6:36–39 ("[A] transmitting device may detect the presence of the receiver power signal (such as a 5 volt power signal) in device discovery."), 7:38–44 ("[T]he transmitter transitions to the pending state 504 upon detecting a logical '1' (+5V) on the VBUS 508."), 8:25–27 ("The transmitter detects the +5V on the VBUS . . . ."), 8:55–59 ("[T]he HDMI transmitter chip 812 and HDMI-E receiver

chip 832 include logic to detect signals on the control bus."), 8:67–9:3 ("The transmitter detects the presence of the receiver's +5V power provided on the transmitter's power/wake enable (PWR/WAKE_EN) pin . . . .)).  "And while the transmitter is a separate element of the claims, the specification is clear that the 'logic' is part of the transmitter."  *Lenovo* Order at 32 (citing '231 Patent at 3:24-26 ("[A] transmitting device and a receiving device each further include logic to detect power signals that are received."), 8:55-59 ("[T]he HDMI transmitter chip 812 and HDMI-E receiver chip 832 include logic to detect signals on the control bus.")).[1]  Moreover, Figure 5 teaches that the "transmitter states" depend on whether the CBUS is low or high, and for how long—meaning the logic is tied to the operation of the structural CBUS.  '231 Patent at 7:28-62.

Given Figures 5 and 8 and the corresponding disclosures in the '231 Patent, Judge Payne correctly found that "a skilled artisan would understand the 'logic to detect' to be a voltage detector internal to the transmitter chip and connected to an input pin of the transmitter."  *Lenovo* Order at 32.  "The output of the detector, which is internal to the transmitter chip, provides the indication of whether the voltage has been detected."  *Id.*  As such, the *Lenovo* Order correctly identifies the relevant structures as "a voltage detector with an input connected to the pin of the transmitter that is connected to the power bus, and equivalents thereof" and "a voltage detector with an input connected to the pin of the transmitter that is connected to the control bus, and equivalents thereof."[2]  *Id.* at 32, 34.

---

[1] Dell argues that "HDMI-M" is supposedly a "coined" term in the '231 Patent and is therefore "not a structure that would have been known to a POSITA at the time."  Br. at 9.  But the structure is not limited to an "HDMI-M" transmitter.  Rather, the "HDMI-M" transmitter embodiment teaches the use of a "transmitter chip" that implements the "logic to detect" and is not necessarily limited to an *HDMI-M* transmitter chip—the '231 Patent more generally teaches that a "transmitter chip detects the voltage."  *Lenovo* Order at 32.

[2] As to the term "logic to detect signals on the cable interface," the *Lenovo* Order correctly explains that claim 10 is written such that the term "includes" a "first logic to detect a voltage value on the

2.    **"logic to discover" / "logic to detect" ('231 Patent, claim 16 and dependents)**

| Term | *Lenovo* Order | Dell's Proposed Construction |
|---|---|---|
| "first logic to detect a first signal on the control bus" | Subject to 35 U.S.C. § 112 ¶ 6<br><br>Function:  detect a first signal on the control bus<br><br>Structure:  a voltage detector with an input connected to the pin of the receiver that is connected to the control bus, and equivalents thereof | Subject to 35 U.S.C. § 112 ¶ 6<br><br>Function: detect a signal on the control bus<br><br>Structure:  Indefinite |
| "second logic to detect a power signal" | Function:  detect a power signal from the receiving [transmitting] device<br><br>Structure:  a voltage detector with an input connected to the pin of the receiver that is connected to a power signal line, and equivalents thereof | Function: detect a power signal from the transmitting device<br><br>Structure:  Indefinite |
| "logic to discover a transmitting device" | "logic to discover"<br><br>Structure: The corresponding structure is defined by the subparts of the limitation. | Function:  discover a transmitting device coupled with the transmitting device<br><br>Structure:  Indefinite |

The "logic to discover" and "logic to detect" terms in claim 16 are also not indefinite because the '231 Patent teaches that those terms have sufficient structure.  The reasoning above for the "logic to detect" terms in claim 10 is equally applicable here.  While claim 10 is directed to functionality of a "transmitting device," claim 16 is directed to functionality of a "receiving device."  The '231 Patent includes similar disclosures in connection with the receiving device as those discussed above in connection with the transmitting device.  *See, e.g.*, '231 Patent at 6:54-

---

power bus" and a "second logic to detect signals on the control bus."  To that end, claim 10 already contains the corresponding structure for the "logic to detect signals on the cable interface," which is "already recited in the 'first logic to' and 'second logic to' limitations for each of these terms." *Lenovo* Order at 37.

56 ("[T]he receiver transitions from the cable disconnect state 402 to the standard device connect state upon detecting a +5 V power signal from the transmitter 408."), 9:43-45 (noting "[t]he cable may include other lines, such as a +5 V power signal line, a hot plug detect, and a USB data channel, which are not illustrated here.").[3]  Accordingly, the *Lenovo* Order correctly identifies the corresponding structure for the "logic to detect" terms of claim 16 as "a voltage detector with an input connected to the pin of the receiver that is connected to [the control bus/a power signal line], and equivalents thereof."

In addition, the *Lenovo* Order explains that the structure of the "logic to discover" is already recited in the other elements of claim 16.  *Lenovo* Order at 37.  Specifically, claim 16 recites "logic to discover" that "includes" a first and second "logic to detect."  As detailed above, the first and second "logic to detect" are taught as structure in the form of "a voltage detector with an input connected to the pin of the receiver that is connected to [the control bus/a power signal line], and equivalents thereof."  As such, the *Lenovo* Order correctly found that the structure of the "logic to discover" is "the structure already recited in the 'first logic to' and 'second logic to' limitations for each of these terms."  *Lenovo* Order at 37.

### 3.    "logic to convert" ('520 Patent, claims 12, 19, and dependents)

| Term | *Lenovo* Order | Dell's Proposed Construction |
|---|---|---|
| "logic to convert each of one or more control signals into a data packet" (claim 12) | Subject to 35 U.S.C. § 112 ¶ 6<br><br>Function:  convert each of one or more control signals into a data packet, each of the one or more control signals being one of a plurality of different types of control signals for a standard protocol, | Subject to 35 U.S.C. § 112 ¶ 6<br><br>Function: convert each of one or more control signals into a data packet<br><br>Structure:  Indefinite |

---

[3] It is also for this reason that Dell's argument that the "HDMI-E" receiver chip is somehow a "coined" term in the '231 Patent and a "would not have described known structures" is unpersuasive.  Br. at 10.  Similar to claim 10 concerning the use of a "transmitter," claim 16's use of a "receiver" connotes structure without being limited to an "HDMI-E" receiver chip.

| | each data packet including a plurality of bits to be transmitted<br><br><u>Structure:</u>  a general-purpose processor, special-purpose processor, or logic circuit programmed to form control signal bytes into data packets that include (1) a header field indicating the type of the packet, and (2) a control field identifying whether the packet is carrying data or a command, and equivalents thereof | |
|---|---|---|
| "logic to convert each of the one or more data packets into a control signal" (claim 19) | <u>Function:</u>  convert each of the one or more data packets into a control signal<br><br><u>Structure:</u>  a general-purpose processor, special-purpose processor, or logic circuit programmed to (1) identify the packet type from a header of a received packet, and (2) identify whether the packet is data or a command from a control field of the received packet, and equivalents thereof | <u>Function:</u>  convert each of the one or more data packets into a control signal<br><br><u>Structure:</u>  Indefinite |

The '520 Patent teaches sufficient structure for the "logic to convert" terms.  *Lenovo* Order at 24-27.  The '520 Patent specification describes in detail how "control signals" are converted to one or more "data packets" and vice versa.  '520 Patent at 1:65-2:1; *see also id.* at 3:34-37; 7:28-38; 7:42-47.  The '520 Patent teaches that the "logic" may comprise "a general-purpose or special-purpose processor or logic circuits programmed with the instructions to perform the processes." *Id.* at 10:4-9.

The *Lenovo* Order explains how Figure 7 "identifies the pin numbers for various HDMI-M signals and standard HDMI signals." *Lenovo* Order at 24.  Figure 7 details how HDMI-M does not use "Pin 13," "whereas the standard HDMI protocol uses that pin for CEC (Consumer Electronics Control), which 'is an optional protocol that provides high-level control functions between all of the various audiovisual products in a user's environment.'" *Id.* (citing '520 Patent

at 3:15-17).  Relatedly, Figure 7 teaches that while HDMI-M uses Pins 15-16 for USB data,

"HDMI uses those pins for DDC (Display Data Channel) clock signals (SCL) and data (SDA)."

*Id.*  Thus, to convey "CEC commands to an HDMI-M device from a standard HDMI device, that

information must be transferred some other way."  *Id.* at 25.

The '520 Patent teaches how to convey the control information in connection with Figures

8 and 9, and the related disclosures.  The '520 Patent teaches the interaction of "control signals"

and "data packets" among various structures, such as the "control bus":

> In some embodiments, the control signals are converted from bytes of data to data
> packets that identify the type of data within each packet. In one particular example,
> HDMI control signals are multiplexed together on the control bus on a byte by byte
> basis. For example, CEC, DDC, and private channel instructions are multiplexed
> together on the control bus. If there is a control signal to be transmitted 212, the
> signal is converted into a data packet for transmission. In an embodiment, the data
> packet may be a data packet as shown in FIG. 8.

'520 Patent at 7:25-38.  In addition, the '520 Patent teaches that these operations are performed

"as 'mapping' standard control protocols to the 1-bit data line using a 'translation layer.'"  *Lenovo*

Order at 26 (citing '520 Patent at 3:4-11 ("a translation layer will describe how standard control

protocols may be mapped to the 1-bit line")).  Figure 8 depicts the results of this conversion:

| 1-Bit Sync 802 | 2-Bit Header 804 | 1-Bit Control 806 | 8-Bit Data 808 | 1-Bit Parity 810 | 1-Bit ACK 812 |
|---|---|---|---|---|---|

The '520 Patent further provides:

> In an embodiment, control data from multiple sources is merged or multiplexed
> onto a single-bit control bus. In an embodiment, control data bytes are formed into
> data packets for transfer on the control bus. In an example, the data packet may be
> data packet 800…. In this example, data packet 802 includes a 1-bit sync signal
> 802, followed by a 2-bit header 804 to indicate the type of data packet contained in
> the data packet 800 and a 1-bit control field 806 to indicate whether the data packet
> contains data or a command. The numbers of bits included in each field may vary
> in different implementations….
>
> The header 804 and control field 806 may, for example, be encoded as provided in

7

FIG. 9. The control field is followed by 8 bits of translation layer data or command 808.

'520 Patent at 9:17-33. As detailed in Figure 9, "the transmitter uses the two header bits to indicate whether the data packet is a DDC packet, a CEC packet, or private channel data." *Lenovo* Order at 26-27. Specifically, "[t]he transmitter uses the control field to indicate that the data 808 represents data or a command." *Id.* For these reasons, the *Lenovo* Order appropriately concludes that the '520 Patent teaches sufficient structure for the "logic to convert" as "a general-purpose processor, special-purpose processor, or logic circuit programmed to (1) identify the packet type from a header of a received packet, and (2) identify whether the packet is data or a command from a control field of the received packet, and equivalents thereof." *Lenovo* Order at 27.

Dell argues that the '520 Patent merely describes the conversion of "control signals to data packets" (and vice versa) as functional language. Br. at 11. However, those arguments fail given the '520 Patent disclosures detailed above. In addition, Dell's argument that the '520 Patent disclosures regarding "multiplexing" are irrelevant because "converting" is a "different function[]" also fails. *Id.* at 12. The '520 Patent details how "HDMI **control signals** are <u>multiplexed together</u> <u>*on the control bus*</u> on a byte by byte basis" (*i.e.*, converts "control signals" to "data packets"). '520 Patent at 7:31-33;[4] *see also id.* at 9:19-20 ("control data bytes are formed into data packets for transfer on the control bus."). The discussion of "multiplexing" is directly tied to the conversion or "mapping" of "control signals" to "data packets" and is tied to the structural "control bus."

### 4.    "logic to arbitrate" ('520 Patent, claims 12, 19, and dependents)

| Term | *Lenovo* Order | Dell's Proposed Construction |
|---|---|---|
| "logic to arbitrate use of the first control bus" | Subject to 35 U.S.C. § 112 ¶ 6<br><br><u>Function:</u> to arbitrate use of the first control bus, the logic to arbitrate use | Subject to 35 U.S.C. § 112 ¶ 6<br><br><u>Function:</u> arbitrate use of the first control bus by determining |

---

[4] All emphasis added unless stated otherwise.

| | | |
|---|---|---|
| | being operable to: [i] determine whether the control bus is in use by the receiving device [/ transmitting device], and [ii] if the first control bus is not in use by the receiving device [/ transmitting device], conduct arbitration for control of the first control bus | whether the control bus is in use by the receiving device [/ transmitting device] and, if the first control bus is not in use by the receiving device [/ transmitting device], conducting arbitration for control of the first control bus |
| | Structure:  a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304-322 of Figure 3, and equivalents thereof | Structure:  Indefinite |

The *Lenovo* Order correctly recognized that the term "logic to arbitrate" was not indefinite in light of Figure 3 and its related teachings. *Lenovo* Order at 29-30.  For example, Figure 3 of the '520 Patent is "an illustration of an arbitration process for a bi-directional, single-bit control bus." '520 Patent at 2:12-16.  The '520 Patent then details the algorithm shown in Figure 3. *Id.* at 7:48 – 8:12; *see also id.* at 5:1-67.  As such, the structure defined in the *Lenovo* Order based on Figure 3 and its teachings should also be adopted here.

Dell largely agrees that should the Court construe the "logic to arbitrate" under § 112 ¶ 6, "then that term must be construed as a computer programmed with software to carry out the arbitration algorithm of, *e.g.*, Fig. 3, 7:48 – 8:12, and 5:1-42." Br. at 13.  Despite Dell's concession that Figure 3 and its related teachings teach an algorithm for performing the recited arbitration functionality, Dell still maintains that the claims are somehow indefinite. *Id.*  Specifically, Dell introduces a new and unrelated argument that the bounds of the teachings in Figure 3 are uncertain and include a supposed "indefinite term of degree under § 112(2)." *Id.*  Dell is wrong.

Dell's attempt to recast the § 112 ¶ 6 analysis should be rejected.  After determining that § 112 ¶ 6 applies, step 2 of the analysis entails "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360,

1365 (Fed. Cir. 2022).  Here, the term at issue is the "logic to arbitrate" and the step 2 analysis considers the teachings in the '520 Patent to ascertain the requisite structure of the "logic to arbitrate."  As the *Lenovo* Order explains, that corresponding structure is present in the '520 Patent as "a general-purpose processor, special-purpose processor, or logic circuit programmed with instructions to perform Steps 304–322 of Figure 3, and equivalents thereof."  Nothing about that structure somehow renders the term "identification component" a subjective "term of degree."

Regardless, Dell's argument that "N" step is indefinite is wrong on the merits.  Br. at 13-14.  Dell maintains that Block 306 of Figure 3 provides that the arbitration process proceeds "CBUS [is] idle or unused for ≥ n cycles."  *Id.*  According to Dell, because "N" is not defined as a specific number of cycles, then the term "identification component" is somehow an indefinite "term of degree."  *Id.*  The "N" simply means that the invention can be implemented by choosing any number of cycles.  However, once the chosen number of cycles passes, the same exact arbitration steps (*i.e.*, algorithm) are implemented and the scope of the algorithm is not impacted by whether the arbitration process begins after 2 cycles or 4 cycles, for example.  *See, e.g.*, *Fractus, S.A. v. AT&T Mobility LLC*, No. 2:18-CV-00135-JRG, 2019 WL 1641357, at *24 (E.D. Tex. Apr. 16, 2019) ("Defendants have not shown … that the possibility of different frequency bands being defined in different ways or with different bandwidths gives rise to any lack of reasonable certainty as to the meaning of the present disputed terms. Instead, these are implementation-specific details.").

**B.     "preemption component" ('905 Patent, claim 21 and dependents)**

| *Lenovo* Order | Dell's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The *Lenovo* Order held that the term "preemption component" of the '905 Patent was not subject to § 112 ¶ 6 and was subject to its plain and ordinary meaning.  The Court should likewise

reject Dell's argument that the term "preemption component" is subject to § 112 ¶ 6 and indefinite. *See* Br. at 15-17.  The term "preemption component" does not use the language "means for" and, accordingly, the presumption is that § 112 ¶ 6 is ***not*** invoked.  *See Dyfan*, 28 F.4th at 1365.  Dell bears the burden of overcoming this rebuttable presumption by a preponderance of the evidence, which it cannot do.  *Id*. at 1367.

Courts in the Fifth Circuit have explained that "[t]he word 'component' is not a 'nonce' word, but rather a common English language word that bears a structural connotation."  *Lodsys, LLC v. Brother Int'l Corp.*, No. 2:11-CV-00090-JRG, 2013 WL 2949959, at *43 (E.D. Tex. June 14, 2013) (holding term "component capable of managing the interactions of the users…" not subject to § 112(6)); *see also E2E Processing, Inc. v. Cabela's Inc.*, No. 2:14-CV-36-JRG-RSP, 2015 WL 4051423, at *3-8 (E.D. Tex. July 2, 2015) (rejecting "selector component," "adapter component," and "integration component" "are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.").  The term "'component' carries a common structural connotation … i.e., dictionary definitions for 'component,' … indicate that 'component' refers to structure."  *Id.*; *see also* Ex. 2 ("Madisetti Decl.") ¶¶ 45-47 (including dictionary definition of "component").  Here, the '905 Patent claims, specifications, and prosecution history confirm that the "preemption component" is not a "nonce" term and has structural meaning.

### 1.    The '905 Patent claims detail the structural nature of the "preemption component"

Claim 21 of the '905 Patent delineates the "preemption component" as a structural component that interacts with other structural elements.  For example, claim 21 recites "communications device for transmitting packets via a communications link" comprising "a transmission component that transmits a first packet" and "a preemption component that signals

the transmission component to stop transmitting the first packet."[5]  The claims detail how the preemption component interacts with the structural "transmission component" to provide the claimed functionality of the "communications device." *See Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1359 (Fed. Cir. 2011) (holding "modernizing device" conveyed sufficient structure based on claims that "delineate the components that the modernizing device is connected to, describe how the modernizing device interacts with those components, and describe the processing that the modernizing device performs"); Madisetti Decl. ¶¶ 45-47.

The body of the claim sets forth the operations of the recited "communications device," including the recited "preemption component."  For example, claim 21 explains how the "preemption component" "signals the transmission component to stop transmitting the first packet," "transmits a preempt indicator indicating that a second packet is to be transmitted," "transmits the second packet," and "signals the transmission component to continue transmitting the first packet.  As such, claim 21 details the interactions of the "preemption component" with the structural "transmission component" within the claimed "communications device.

Examining the claim language, the *Lenovo* Order correctly recognized that the relevant limitations "state[] the steps implemented by the component" and that what Dell "calls 'functions' are actually 'acts within the claim itself to perform entirely' what the recited function would have been if the limitation was structured in conventional means-plus-function format."  *Lenovo* Order at 16 (citing *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998)). This Court should likewise hold that § 112 ¶ 6 does not apply to the "preemption component."

---

[5] Notably, Dell does not contend that the recited "transmission component" is indefinite for lacking a corresponding structure.

2.      **The specification and prosecution history of the '905 Patent confirm that the "preemption component" has structural meaning**

The structural nature of the "preemption component" is detailed in the '905 Patent specification. *See E2E*, 2015 WL 4051423, at *6 ("the specification [] provides context as to the 'inputs and outputs' and how the 'selector component' 'interacts with other components ... in a way that ... inform[s] the structural character of the limitation-in-question or otherwise impart[s] structure.'"). For example, the '905 Patent explains that the recited "communications device" comprises structural components, such as in connection with Figure 2, which illustrates structural "components of the transport layer, link layer, and physical layer" where "[e]ach layer includes transmit components 201 and receive components 202." '905 Patent at 9:8-15; Madisetti Decl. ¶48. Figure 2 demonstrates the structural nature of the various components of the transport layer, link layer, and physical layer, such as "memory" and "controllers." *Id.* Indeed, Dell previously identified "transmitter 231" in Figure 2 as a structure that corresponds to the "transmission component" recited in claim 21 of the '905 Patent—meaning Dell agrees that the "transmission component" refers to a structural component, such as a "transmitter." Ex. 3 (Dell's 07-21-25 Disclosure of Constructions) at 13. The "preemption component" refers to structural portions of the "communications device" that interact with that structural "transmission component" to provide the claimed functionality. Madisetti Decl. ¶¶ 47-48.

The specification further delineates the "inputs and outputs" of the "preemption component." *E2E Processing*, 2015 WL 4051423, at *6. For example, the '905 Patent details the packet preemption functionality of the "preemption component" in terms of the operations implemented in the "transport layer" and "link layer." '905 Patent at 20:4-25 ("When a data packet is to be preempted, the transport layer of the communications node stops providing the codes of the data packet to the link layer, signals the link layer to transmit a preempt primitive, and then

starts providing the code of the control packet to the link layer for transmission as a preempting packet."); Madisetti Decl. ¶ 52.  Figures 13 and 14 detail the packet preemption functionality, which is implemented through the link layer and transport layer in conjunction with the physical layer.  *See* '905 Patent at 20:42-44 ("In block 1401, <u>the component of the transport layer</u> retrieves the next packet from the transmit memory."); 20:64-67 ("In block 1410, <u>the component signals the link layer</u> to transmit a continue primitive …"); Madisetti Decl. ¶¶ 53-55.

Finally, the prosecution history further confirms that the "preemption component" has structural meaning.  Neither the Examiner nor the Applicant ever contended that either of the Component Terms were subject to § 112(6).  *See* Madisetti Decl. ¶ 49.  Further, the Examiner issued a rejection to a claim containing the "preemption component" during prosecution, noting "the '***components***' as claimed are discussed on page 8 lines 38+, page 8 lines 55+, and page 9 lines 8+."  *Id.* (citing Ex. 4 (Nov. 15, 2005 Non-Final Rejection) at 3).  Thus, the Examiner considered the recited "preemption component" to have sufficient structure.

### 3.    The "preemption component" is not indefinite

Should the Court find the presumption against 112(6) is overcome, the Court must next consider whether Dell can prove by clear and convincing evidence that the claims of the '905 Patent are indefinite for lack of corresponding structure, as discussed in detail above and as identified by Dr. Madisetti.  Madisetti Decl. at Section IV.

### C.    "an identification component" ('798 Patent, claim 19 and dependents)

| ***Lenovo*** **Order** | **Dell's Proposed Construction** |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6 | Subject to 35 U.S.C. § 112 ¶ 6 |
| <u>Function:</u> identifies a packet type of a packet of symbols | <u>Function:</u> Identifying a packet type of a packet of symbols |
| <u>Structure:</u> "a general-purpose processor, special-purpose processor, or logic circuit | <u>Structure:</u>  Indefinite |

14

| programmed to determine whether the packet was removed from a control queue or a data queue, and send an indication of whether the packet was removed from the control queue or the data queue to the transport layer" | |
|---|---|

The '798 Patent teaches sufficient structure for the term "identification component" and is not indefinite. For example, Figure 2 details the "components of the transport layer, link layer, and physical layer," which includes a "transmission component" (such as transmitter 231) that interacts with the "identification component." The '798 Patent specification explains the relevant operations in connection with the "transport" and "link" layers:

> **Immediately prior to transmitting control packet 902 (e.g., command, status, or message packets), the transport layer of the transmitting communications node signals the link layer that a control packet is to be transmitted next**. The link layer then transmits a synchronization primitive 901 encoded with a packet type of control. After the packet has been transmitted, the link layer of the transmitting communications node starts transmitting the idle primitive. **Immediately before the transport layer transmits data packet 904, it notifies the link layer that a data packet is to be transmitted**.

'798 Patent at 15:4-14. As Judge Payne explained, "the transport layer must perform the identification, because that layer 'provides the packet type to the link layer.'" *Lenovo* Order at 19 (citing '798 Patent at 14:44-45) ("the transport layer provides the packet type to the link layer."). The "transmission component"—which interacts with the "identification component" in the '798 Patent claims—"exists in the link layer, which receives the packet type from the transport layer and 'can then transmit a synchronization primitive that indicates packet type immediately before the packet itself.'" *Id.*

In addition, the '798 Patent specification further details the structure and operation of the "identification component" in connection with Figures 10, 11, and 12 and the related disclosures. Figures 10-11 detail that the identification functionality is executed in connection with "packet memory 211," which is a "component of the transport layer." *Id.* at 18:46-19:10. In connection

15

with Figure 11, the '798 Patent explains that "[t]he component may determine the type of the packet either from the type field of the packet header or, when the packet is received from another communications node, from a synchronization primitive encoded with the packet type." *Id.* at 18:65 – 19:2. Further, Figure 12 is "a logic diagram illustrating the transport layer processing of packets stored in the packet memory in one embodiment." '798 Patent at 19:11-13. In detailing the operations of Figure 12, the '798 Patent teaches:

> In decision block 1201, if the control queue is empty, then the component continues to block 1203, else the component retrieves a control packet from the control queue in block 1202 and continues at block 1205. In decision block 1203, if the data queue is empty, then the component again checks for a packet in the control queue, else the component retrieves a packet from the data queue in block 1204 and continues at block 1205.

*Id.* at 19:13-16. As Judge Payne explained, this disclosure explains "how to determine the packet type" and "after which the packet type must be sent to the link layer." *Lenovo* Order at 20. Accordingly, the corresponding structure for the "identification component" is "a general-purpose processor, special-purpose processor, or logic circuit programmed to determine whether the packet was removed from a control queue or a data queue, and send an indication of whether the packet was removed from the control queue or the data queue to the transport layer." *Id.*

Dell's indefiniteness arguments are unpersuasive. Br. at 18-19. Dell admits that the "transport layer" can "perform certain functions" and, as detailed above, those functions involve the "identification component" functionality recited in the '798 Patent claims. Dell also fails to address the relevant teachings in connection with Figures 10, 11, and 12, which the *Lenovo* Order explains teach the relevant structure for the "identification component." As such, Dell's indefiniteness challenge to the "identification component" should be rejected.

### D.    "application data and control bits" ('307 Patent, all asserted claims)

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| No construction necessary. | The application data and control bits are not encoded as special characters. |

"Absent disclaimer or lexicography, the plain meaning of the claim controls." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012).  Here, Dell argues the Court should depart from the plain and ordinary meaning of the term "application data and control bits" to preclude encoding those bits "as special characters."  But Dell cannot justify departing from the plain and ordinary meaning and its proposed construction should be rejected.[6]

The patentee made deliberate decisions as to which claims to include any requirements regarding the use of "special characters."  Notably, none of the asserted independent claims of the '307 Patent (*i.e.*, 1, 23, 53, and 68) include any requirements regarding encoding "application data and control bits" as "special characters."  Rather, the dependent claims first introduce requirements that the "line code" specify "a block code and special characters."  Had the patentee intended to include requirements regarding "special characters" in the independent claims, it would have specified those requirements—as it did in independent claim 41 (not asserted) or the dependent claims.  *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1305 (Fed. Cir. 1999) ("the narrower claim 11 adds a thermal compensation function expressly not included in the broader claims 3, 5, and 8. Had Rodime intended or desired to claim thermal compensation as a function of the positioning means in the asserted claims, it could have done it explicitly, as in claim 11.").

---

[6] Dell also appears to import a non-infringement argument by seeking to exclude the use of "K-codes" from the scope of the claims.  Br. at 19-20.  That is not a basis for its construction.  *See Visionix, Inc. v. United States*, 150 Fed. Cl. 486, 509 fn. 2 (Fed. Cl. 2020) ("To the extent defendants are attempting to raise infringement-related concerns at the claim construction phase, such arguments are premature.").

Dell cannot justify its narrow construction based on the disclosures in the specification. For example, Dell argues that the "specification emphasizes that special characters are different than and distinguishable from encoded application data and control bits." Br. at 19-20. But the fact that the '307 Patent provides exemplary characterizations of the invention that distinguish between "special characters" and "encoded application data and control bits" does not mean that the claims should be re-written to preclude application data and control bits from being encoded as special characters. To the contrary, the '307 Patent explains that the disclosures cited by Dell concern "typical embodiments" when describing exemplary portions of the invention. *See* '307 Patent at 5:15-19. Indeed, even if Dell were correct that all of the embodiments of the '307 Patent preclude encoding with "special characters" (it is not), it would still be improper to limit the claims in that manner. *See Apple Inc. v. Wi-LAN Inc.*, 25 F. 4th 960, 967 (Fed. Cir. 2022) ("Embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's words or expressions of manifest exclusion or restriction.").

Likewise, the Court should reject Dell's argument that the '307 Patent's use of phrases like "the invention" limits the claims because use of such language is generally not viewed as limiting where such use is "not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Absolute Software, Inc. v. Stealth Signal, Inc*., 659 F.3d 1121, 1136–37 (Fed. Cir. 2011). For example, in the '307 Patent, the patentee consistently used phrases such as "typically" and "in preferred embodiments" when referring to use of special characters. This is true even in portions of the specification cited by Dell.[7]

---

[7] *See, e.g.*, '307 Patent at 5:15 ("In typical embodiments"), 5:25-26 ("preferred embodiments"), 8:38 ("[i]n a class of embodiments"), 8:47 ("typically also specifies special characters"), 8:53 ("typically"), 8:63 (typically)), 9:56 (introducing cited portion of column 10 as "a block diagram of a typical system"), 10:55 ("in preferred embodiments"), 16:39 ("in preferred embodiments").

Finally, Dell's argument based on alleged prosecution history disclaimer in the *inter partes* review ("IPR") of the '307 Patent is unavailing. Specifically, Dell points to statements in UCT's Patent Owner Preliminary Response ("POPR") as alleged support for its prosecution history disclaimer argument, stating that "UCT distinguished prior art on the basis that it did not teach 'encoding *both* application data *and* control bits together." Br. at 20 (citing POPR at 1-2). Dell takes UCT's statements out of context because UCT's arguments in the POPR were not related to whether application data and control bits could be encoded as special characters. Rather, UCT's POPR argued that the alleged "control bits" in Petitioner's prior art are not encoded or decoded as recited in the claims. For example, with respect to Petitioner's primary reference, Shin, UCT argued that "Shin does not encode or decode control bits… Shin teaches encoding *data* at the link layer – not the alleged 'control bits'" which are instead "added to the sequence of codewords *after* the data is encoded." POPR at 45. This does not support a "clear and unmistakable" disclaimer. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013). Indeed, UCT's arguments in its POPR had nothing to do with whether application data and control bits could be encoded *as special characters*. The portions of the POPR cited by Dell confirm this.[8] Dell's arguments should be rejected.

---

[8] For example, Dell points to UCT's description of special characters on page 3 of its POPR which states that "[t]he line code also specifies certain special characters which are distinguished from the code words" but that portion of the POPR is merely describing a particular exemplary embodiment of the invention as shown in Figure 1, it does nothing to limit the scope of the term "application data and control bits." Likewise, Dell's citation to page 25 of the POPR does not support disclaimer because those are merely quotes from the '307 Patent specification that provide exemplary embodiments much like the examples from the specification discussed above and cited by Dell. None of these passages limit the scope of the term "application data and control bits," such that they cannot be encoded as special characters.

E.    **"AV sink operation mode" and "AV source operation mode" ('265 Patent, all claims)**

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| Plain and ordinary meaning.<br><br>No further construction necessary. | AV sink operation mode: A mode in which the AV device receives (but does not provide) power and receives (but does not send) data<br><br>AV source operation mode: "A mode in which the AV device provides (but does not receive) power and sends (but does not receive) data." |

The plain language of the '265 Patent claims detail the relevant functionality required for the recited "AV sink operation mode" and "AV source operation mode." *See* Madisetti Decl. ¶¶ 79-80.  For example, independent claim 8 details "[a]n audio/video (AV) device" that comprises "communication logic" configured to implement (1) "an AV sink operation mode for the communication logic to receive AV data provided to the AV device at the connector and to receive power from a first supply voltage provided to the AV device via a channel of the connector" and (2) "an AV source operation mode for the communication logic to send AV data from the AV device via the connector and to provide a second supply voltage at the channel of the connector." Independent claims 1 and 14 contain similar limitations.  Because the claims already delineate the required functionality for the recited "AV sink operation mode" and "AV source operation mode," the plain and ordinary meaning controls and no construction is necessary.

Dell's proposed construction goes further than the requirements of the claims by requiring that the AV Device always only receives both power and data when in "AV sink operation mode" and only provides both power and data when in "AV source operation mode."  However, Dell's attempt to always require the exchange of both power and data in the AV sink/source operation modes conflicts with the express claim language.  For example, claim 8 recites:

> control logic including circuitry … to configure the communication logic to transition the AV device from the AV sink operation mode to the AV source

operation mode <u>in response to determining that **the first supply voltage is not provided** at the channel of the connector.</u>

In other words, this limitation contemplates that the recited AV device is in the "AV sink operation mode" but <u>not</u> receiving power (*i.e.*, "the first supply voltage") and, consequently, transitions to "AV source operation mode." *See* Madisetti Decl. ¶¶ 79-80. Independent claims 1 and 14 contain similar requirements. As such, the independent claims all expressly contemplate a situation where the AV device is in "AV sink operation mode" and not receiving power. Thus, Dell's proposed construction cannot be correct because it directly contradicts that operational state by expressly requiring that the AV device always "receive" "power" while in "AV sink operation mode."

In addition, the claims are silent as to the exchange of "AV data" when transitioning from the "AV sink operation mode" to the "AV source operation mode" when there is no supply voltage. Yet, Dell's proposed construction requires that the AV device "receives" "data" even when detecting there is no supply voltage because it is still in "AV sink operation mode" before the transition to the AV sink mode. But there is no such requirement in the claims regarding the flow of data at that time and it is improper to import extraneous limitations into the claims.[9] Dell's proposed construction should be rejected.

F.    **"mobile device" ('520 Patent, all claims and '231 Patent, claim 14)**

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| Any mobile electronic device | A cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other |

---

[9] Dell's argument that its construction is consistent with the teachings of the specification fails. Br. at 21-22. Notably, Dell cobbles together citations from different teachings and embodiments in attempting to argue that the '265 Patent teaches two "mutually exclusive modes." But a review of those cited disclosures reveals that they do not provide any further limitations or teachings limiting the flow of both data and power in the AV sink/source modes. *See* Br. at 22 (citing '265 Patent at 2:26-31 (discussing flow of "AV information" only) and 5:46-54 (discussing what the modes "may" include "[i]n an embodiment")).

| | similar devices (i.e. portable devices smaller than a standard device such as a personal computer or monitor). |
|---|---|

The '520 and '231 Patents define a "mobile device" as "any mobile electronic device." '520 Patent at 2:36-37; '231 Patent at 2:50.  UCT proposes construing the term "mobile device" in accordance with that definition.  The term is easy for the jury to understand, and the patents provide examples of "mobile devices" to assist the jury in understanding the scope of intended "electronic device[s]."  For example, the patents teach that "[t]he term 'mobile device' includes, but is not limited to, a cellular telephone, smartphone, PDA (personal digital device), MP3 or other format music player, digital camera, video recorder, digital storage device, and other similar devices."  '520 Patent at 2:36-40; '231 Patent at 2:50-54.  Thus, the Court should adopt UCT's proposed construction.

Dell's construction is unduly narrow.  First, Dell seeks to construe the "mobile device" solely by the exemplary "mobile devices" described in the patents.  But the patents make clear that the "mobile device" may be one of those devices but is "not limited to" those exemplary devices. The patents are silent as to whether it includes or excludes "personal computers" (PCs) or "monitors."  Indeed, the patents expressly provide that "embodiments of the invention are not limited to any particular type of data or device."  '520 Patent at 2:59-61; '231 Patent at 3:2-3.  As such, the construction of "mobile device" should not be limited to any exemplary devices.

In addition, Dell's construction provides a further restriction that a "mobile device" is a "portable device[] smaller than a standard device such as a personal computer or monitor."  But there is no basis in the patents for Dell's limiting construction (1) that requires a "portable" device, (2) that is "smaller than a standard device," and (3) expressly precludes a "personal computer or monitor" from the scope of possible "mobile devices."  Even if there were a requirement that the "mobile device" be both "portable" and "smaller than a standard device" (there is none), those

requirements would not necessarily preclude a "personal computer or monitor" from the scope of

"mobile devices."  For example, laptop computers and tablets are "portable," are "smaller than a

standard device" (such as a television monitor), are "personal computer[s]," and/or can be used as

an additional computer "monitor."  Yet, Dell seeks to preclude such products from the scope of

the term.[10]  The issue of whether a particular device—such as a PC or monitor—qualifies as a

"mobile device" is an issue of fact for the jury to decide.  Dell's construction should be rejected.

### G.    "standard protocol" / "modified protocol" ('520 Patent, all claims)

| Terms | *Lenovo* Order | Dell's Proposed Construction |
|-------|---------------|------------------------------|
| "standard protocol" | "a standardized communication protocol" | A communication protocol that was standardized as of the January 4, 2008 filing date of the '520 Patent. A device utilizing the standard protocol communicates over multiple control buses. |
| "modified protocol" | "a modification of the standard protocol that is not included in the standard protocol" | A communication protocol that is a modification of the standard protocol, and that was defined as of the January 4, 2008 filing date of the '520 Patent. A device utilizing the modified protocol communicates over one (and only one) control bus. |

Dell improperly seeks to limit the terms to require 1) a protocol that existed at the time the

patent was filed, and 2) "multiple control buses" / "one (and only one) control bus."  First, the

terms are not time-related and not limited to specific versions of protocols that existed at the time

of the invention.  Rather, the claims and specification use the term "modified protocol" as a

relative term in comparison to a "standard protocol," which is not inherently time-limited.  *See*

Ex. 5 at 41 (Defendants' IPR petition explaining that "[t]he '520 patent describes a 'modified

---

[10] Dell's argument that the patentee somehow excluded PCs from the definition of "mobile device" because "the '520 Patent proposes a new compact interface (HDMI-M) for mobile devices" is inapposite.  Br. at 23.  Even if Dell is correct, that reasoning still does not necessarily preclude laptops and/or tablets from qualifying as a "mobile device."  After all, had the patentee intended to exclude "PCs" from the term "mobile device," it would have done so.  In addition, the fact that the '520 Patent notes that a "television monitor" may be a "standard" HDMI device does not address other types of monitors, such as the use of a computing tablet as a computer "monitor."

protocol' as a relative term in comparison to a 'standard protocol'").  The claims themselves expressly recite the relationship between the "modified protocol" and the "standard protocol": "the modified protocol being a modification of the standard protocol that is not included in the standard protocol."  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("The claims themselves provide substantial guidance as to the meaning of particular claim terms.").

The *Lenovo* Order correctly found that the term "standard" "is not used by itself, but rather in juxtaposition to 'modified,' the use of the latter in combination with the former emphasizes that what matters in these claims is not the protocol itself, but the difference between the two related versions of the same protocol."  *Lenovo* Order at 42.  As such, Judge Payne explained that "the specifics of the protocol are unimportant to the claim" and held that the terms "are not limited to the protocols in existence on the filing dates of the patent."  *Id.* at 43.

Moreover, the holding in *Cellspin* supports Judge Payne's analysis in the *Lenovo* Order. *See Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 17-CV-05928-YGR, 2021 WL 1417419, at *10 (N.D. Cal. Apr. 14, 2021).  There, the court rejected an argument that the term "Bluetooth" should be limited to versions of the standard available at the time of the invention.  *Id.* ("[T]he Court finds that the better view is to not limit technical standards to any version.").  *Cellspin* confirms that the terms here should not be limited to standards/protocols that existed at the time of the invention.[11]  Dell is incorrect that "what qualifies as 'standard'…would improperly change over

---

[11] Dell's citation of *PC Connector* (Br. at 24) is inapposite because it involved a claim that was time-dependent—the claims at issue in *PC Connector* recited "each separate end user computer peripheral is **traditionally connectable** to a computer by means of an input/output port of the computer and the standard input/output port of the particular separate computer peripheral."  *Id.* at 1361.  In the context of that specific claim language, the Federal Circuit found that "traditionally connectable" referred to input/output technologies existing at the time of the invention.  *Id.* at 1363.  However, *PC Connector* is inapplicable to claims, like those at issue here, where the claims are not inherently time-related.  For example, in *Cellspin*, the court distinguished *PC Connector*

time." Br. at 24. The meaning of the claim language here does not change over time. The term "standardized communication protocol" has the same meaning today as it had in 2008. The fact that new standards may be developed in the future simply means that new products may be developed in the future that infringe the claim.

Second, for its limitation regarding "multiple control buses" / "one (and only one) control bus," Dell improperly seeks to import limitations from the specification. Br. at 25 (relying on Figs. 6 and 7). But Dell cannot identify any lexicography or disavowal that would support its limitations. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The fact that certain embodiments may include this feature does not support importing that limitation into the claim language that plainly does not require "multiple control buses" / "one (and only one) control bus." *Apple*, 25 F.4th at 967. Moreover, the '520 Patent expressly confirms that while certain embodiments are described in the context of a "standard HDMI device," the "embodiments of the invention are not limited to any particular type of data or device." '520 Patent at 2:54-61.

The dependent claims further contradict Dell's limitation. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."). For the "standard protocol," Claim 1 simply recites "***converting one or more signals for a standard protocol to one or more data packets***, each of

---

and explained that *PC Connector* involved terms that were "inherently time-related" and that "thus provides no support for limiting a technical standard to the versions available at the time of invention." 2021 WL 1417419, at *10. The *Lenovo* Order likewise found *PC Connector* unpersuasive in light of the claim language. *Lenovo* Order at 42.

the one or more control signals representing one of a ***plurality of different types of control signals***" and that the "one or more data packets" be "transmit[ed] … via the first control bus." However, claim 8, which <u>depends</u> from claim 1, adds the requirement that the "plurality of different types of control signals" "be transmitted over a plurality of different control busses.". Dell's proposed construction is therefore contradicted by dependent claim 8, which adds the requirement of "a plurality of different control busses," and confirms that a POSITA would understand that the independent Claim 1 does not require "a plurality of different control buses," or as Dell's proposed construction puts it, "multiple control buses." Madisetti Decl. ¶¶ 59-62.

Dell's reliance on UCT's IPR arguments also fails to support its limitations. Br. at 25-26. Dell cannot identify any "clear and unmistakable" disclaimer. *See 3M Innovative Props.*, 725 F.3d at 1325. To the contrary, the quoted portions of UCT's IPR arguments simply provide a background discussion of the embodiments taught in the specification and do not distinguish the prior art based on the limitations Dell seeks to import into the claims—rather, UCT distinguished the prior art based on the fact that it failed to disclose the plain language of the claim. Dkt. No. 77-28 at 3.

## H.    "the modified protocol being a modification of the standard protocol that is not included in the standard protocol" ('520 Patent, all claims)

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite. |

Dell cannot meet its burden to prove indefiniteness by clear and convincing evidence. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). First, Dell is incorrect that the phrase requires "two mutually-exclusive characteristics." Br. at 26. For example, nothing in the claim language or specification suggests Dell's purported requirement that the "modified protocol" "inherits no features of the standard protocol." *Id*. The specification demonstrates that

the phrase is well-understood by a POSITA.  Madisetti Decl. ¶¶ 73-74.  For example, the specification describes the HDMI protocol as an exemplary "standard protocol" for communications between devices. '520 Patent at 6:33-35.  And the specification describes the Universal Serial Bus ("USB") as an exemplary "modified protocol," over which "standard protocol," *e.g.*, HDMI, communications can occur, thereby allowing a connection to devices that utilize the "standard protocol." '520 Patent at 2:61-67.

Dell is further incorrect that the claim requires a POSITA to "determine the degree of modification." Br. at 26.  The claim does not recite a term of degree like "***substantially*** modified." Rather, the term recites a binary determination that is not indefinite: either the protocol is a modification of the standard protocol or it is not.[12]  Dell further misunderstands the Patent Trial and Appeal Board's (PTAB) statement:

> Similarly, prevailing on the "modified protocol" issue would require proving that the HDMI–C protocol, which uses the same separate channel arrangement for CEC and DDC as standard HDMI, is sufficiently "modified" to meet the claim.

Dkt. 77-29 at 20.  In this context, the PTAB was explaining that the IPR Petition failed to present a strong argument for the "modified protocol" where the prior art used the same channel arrangement.  Finally, Dell misrepresents Dr. Madisetti's testimony.  Br. at 27.  Dr. Madisetti testified that the terms have their plain meaning (Ex. 6 (Madisetti Dep. Tr.) at 46:7-24) and

---

[12] *See L2 Mobile Techs. LLC v. TCL Elecs. Holdings Ltd.*, No. 1:22-CV-01306-JDW, 2024 WL 986918, at *3 (D. Del. Mar. 7, 2024) ("[T]he modifier 'accurately' is a binary term: reestablishment either is or is not performed. This does not denote an undefined degree that would render the term indefinite to a person of ordinary skill in the art."); *WSOU Invs., LLC v. F5 Networks, Inc.*, No. 2:20-CV-01878-BJR, 2022 WL 268825, at *4 (W.D. Wash. Jan. 28, 2022) ("The Court [] agrees with Plaintiff that 'not fully connected,' as used in the specification, is better understood as a binary term referring to any port that is not completely connected to the network."); *Vstream Techs., LLC v. PLR Holdings, LLC*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550, at *9 (E.D. Tex. Sept. 27, 2016), *report & recommendation adopted*, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016) (term "implicates a binary determination: either the recommendation is accepted, or the recommendation is not accepted. The claim does not require a subjective determination….").

expressly disagreed that the terms can only be understood by reference to the accused products (*id.* at 62:18-23).

I.    **"the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" ('231 Patent, 10 and dependents)**

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| No construction necessary. | The transmitter to drive a first signal value on the control bus in regular, repeated cycles upon transitioning to the pending state |

In an effort to limit the number of disputes for the Court, UCT agrees that the term "the transmitter to drive a first signal value on the control bus periodically upon transitioning to the pending state" of claim 10 (and its dependents) of the '231 Patent should be construed as "the transmitter to drive a first signal value on the control bus in regular, repeated cycles upon transitioning to the pending state." However, UCT's agreement is not premised on and in no way adopts Dell's reasoning and arguments concerning this term, which UCT does not agree with.

J.    **"first physical channel" ('103 Patent, all claims)**

| UCT's Proposed Construction | Dell's Proposed Construction |
|---|---|
| a physical path for transmitting electrical signals[13] | A Transition-Minimized Differential Signaling (TMDS) channel. |

Dell cannot justify its unduly narrow construction that requires the "first physical channel" to be limited to a "Transition-Minimized Differential Signaling (TMDS) channel." Dell fails to

---

[13] Dell originally identified the term "first physical channel" and the term "physical channel" (both present in all asserted claims of the '103 Patent) as proposed terms for construction. Ex. 7 (Dell Second Supp. Disclosure of Terms 7-7-25) at 9. In Dell's July 21, 2025 Disclosure of Proposed Claim Constructions, Dell proposed that the term "physical channel" be construed as "[a] single physical path for transmitting electrical signals" and that the term "first physical channel be construed as "[a] Transition-Minimized Differential Signaling (TMDA) channel." Ex. 3 (Dell 7-21-25 Constructions) at 17. UCT proposed that the two terms have the same construction, "a physical path for transmitting electrical signals." Ex. 8 (UCT's 7-21-25 Constructions) at 12. Dell dropped the term "physical channel" as a proposed term for construction. Ex. 9 (Schuneman Email 8-15-25).

identify any lexicography or disclaimer that warrants departing from the plain and ordinary meaning of the term (*i.e.*, "a physical path for transmitting electrical signals."). *See Toshiba Corp.*, 681 F.3d at 1369. While the '103 Patent teaches that the "first physical channel" *may* comprise a TMDS channel, the '103 Patent never limits the term to only a TMDS channel. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (for lexicography "a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning."). Limiting the scope of the term to the exemplary embodiments is improper. *See Apple*, 25 F. 4th at 967.

Dell's reliance on the prosecution history also fails. Br. at 28. Dell relies on several statements from the patent examiner. Br. at 28. But "it is the applicant, not the examiner, who must give up or disclaim subject matter[.]" *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1379 (Fed. Cir. 2005). And, "an applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005).

Although Dell "cite[s] a slew of cases [it] contend[s] stand for the proposition that such silence in the face of an examiner's purported misrepresentation amounts to a disclaimer, [] none of those cases support the existence of such a rule—much less its application here."[14] *Polaris*

---

[14] The Federal Circuit has explained the *Torphram* case "does not hold that a patentee's silence in the face of an examiner's unilateral statements in a Notice of Allowance amounts to a clear disavowal of claim scope." *Salazar*, 414 F.3d at 1346. Further, *Biogen* affirmed a disclaimer where "it [was] clear that [patentees] were limiting their invention to what the examiner believed they enabled." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013). The *ACCO* case is inapposite because the examiner "simply repeated" the same express arguments already presented by the applicant—unlike here, where the examiner summarized telephonic calls. *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003). Finally, in *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 554-55 (Fed. Cir. 2020), the disclaimer was based on the patentee's amendments to align with the examiner's understanding.

*PowerLED Techs., LLC v. Dell Techs., Inc.*, No. 1:22-CV-973-RP, 2025 WL 2182327, at *6 (W.D. Tex. Mar. 4, 2025). First, it is unclear whether the examiner's statements even concern the "first physical channel" limitation as opposed to some other aspect of the invention (such as the multimedia link). Additionally, a review of the applicant's statements regarding that limitation reveals that the applicant never limited the scope of the term to only a TMDS channel.

**K.    "the first synchronization signal" ('103 Patent, claim 17)**

In light of the *Lenovo* Order's holding that claim 17 of the '103 Patent is indefinite, UCT is no longer pursuing this claim in this action.

Dated: September 26, 2025                    Respectfully Submitted:

                                            */s/ Brett E. Cooper*
                                            Brett E. Cooper (NY SBN 4011011)
                                            bcooper@bc-lawgroup.com
                                            Seth Hasenour (TX SBN 24059910)
                                            shasenour@bc-lawgroup.com
                                            Jonathan Yim (TX SBN 24066317)
                                            jyim@bc-lawgroup.com
                                            Drew B. Hollander (NY SBN 5378096)
                                            dhollander@bc-lawgroup.com
                                            Ashley M. Ratycz (IL SBN 6330321)
                                            aratycz@bclgpc.com
                                            **BC LAW GROUP, P.C.**
                                            200 Madison Avenue, 24ₕ Floor
                                            New York, NY 10016
                                            Telephone: (212) 951-0100

                                            Andrea L. Fair
                                            State Bar No. 24078488
                                            **MILLER FAIR HENRY, PLLC**
                                            1507 Bill Owens Parkway
                                            Longview, TX 75604
                                            (903) 757-6400 (telephone)
                                            (903) 757-2323 (facsimile)
                                            andrea@millerfairhenry.com

                                            *Attorneys for Plaintiff Universal Connectivity Technologies Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on September 26, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

<u>*/s/ Brett E. Cooper*</u>
Brett E. Cooper